COMMONWEALTH vs. SUZANNE D'AMOUR
(and a companion case[1]).

Hampshire. November 5, 1998. - January 27, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, & IRELAND, JJ.

*Search and Seizure,* Warrant, Plain view, Probable cause. *Constitutional Law,*
Search and seizure, Waiver of constitutional rights, Double jeopardy.
*Electronic Surveillance. District Attorney. Probable Cause. Evidence,*
Wiretap, Relevancy and materiality. *Grand Jury. Waiver. Perjury. Practice,
Criminal,* Instructions to jury, Sentence. *Conspiracy.*

Police officers executing a search warrant in the house in which the victim
    was murdered properly seized a love letter, written by the victim's wife to
    another man, in which she stated her hatred of the victim, where the letter
    was in plain view, where the officers had a right to examine the letter to
    determine whether it was within the scope of the warrant, and where the
    discovery was inadvertent. [730-732]
A district attorney's authorization of an assistant district attorney to obtain a
    wiretap warrant was proper and appropriately limited in scope, and, in the
    circumstances, the warrant and renewals were not rendered invalid by the
    district attorney's failure to cosign the application or to provide written
    authorization for each renewal. [733-735]
In the circumstances of a murder case, there was sufficient probable cause to
    believe that crimes had been or were being committed in connection with
    organized crime so as to justify issuance of a wiretap warrant. [735-737]
An application for a wiretap warrant was properly sworn to by the applicant.
    [737-738]
Delay in sealing the fruit of wiretap warrants in a murder case was reasonable
    in the circumstances, was not done in bad faith, and did not prejudice the
    defendant [738-741], and, where the recordings were sealed each day in
    accordance with a judicial order, there was no basis under 18 U.S.C.
    § 2518(8)(a) for suppression of the evidence in the judge's declining to
    open the sealed containers and examine the recordings [741].
A grand jury witness who is informed of her right to remain silent, her right
    to an attorney, and the fact that her testimony could be used against her, is
    not entitled, before testifying before the grand jury, to notification from the
    prosecutor that she is a potential defendant in the matter under investiga-
    tion. [741-743]
Sufficient evidence was presented at the trial of indictments to warrant the
    defendant's conviction of two counts of perjury, where the defendant's
    false statements to a grand jury, if believed, would have impeded the grand

[1]Suzanne D'Amour *vs.* Commonwealth.

jury's investigation, and thus were material to the grand jury's determination [743-745]; further, the judge's instructions to the petit jury on the issue of materiality were appropriate [745-746].

At the trial of indictments in which the defendant was convicted of two counts of perjury but acquitted of a charge of murder, the judge's sentence of concurrent terms of from ten to twelve years was not demonstrated to be unlawful punishment for the crime of which she was acquitted, or otherwise erroneous. [746-747]

Where a defendant was acquitted of murder tried on a theory that the defendant hired another to kill her husband, conspiracy to commit murder was, in the circumstances of the case, a lesser included offense, and a subsequent trial on the conspiracy charge was barred by principles of double jeopardy [747-749]; and the defendant's election of separate trials on the two indictments pursuant to Mass. R. Crim. P. 9 (e) did not constitute a "waiver" of her double jeopardy rights [749-750].

INDICTMENTS found and returned in the Superior Court Department on June 6, 1995.

Pretrial motions to suppress evidence were heard by *Francis X. Spina*, J., and *John F. Murphy, Jr.*, J.; the cases were tried before *Murphy*, J.; and a posttrial motion to dismiss a conspiracy indictment was heard by *Daniel A. Ford*, J.

The Supreme Judicial Court granted an application for direct appellate review of convictions of perjury and attempted perjury.

An application for leave to prosecute an interlocutory appeal from the denial of the motion to dismiss the conspiracy indictment was considered by *Fried*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him. The direct and interlocutory appeals were consolidated.

*Wendy H. Sibbison* for the defendant.

*Judith Ellen Pietras*, Assistant District Attorney (*David S. Ross*, Assistant District Attorney, with her) for the Commonwealth.

ABRAMS, J. We allowed the defendant's application for direct appellate review of her convictions of perjury (two indictments) and attempted perjury (one indictment). A single justice of this court reserved and reported the correctness of the denial of the defendant's motion to dismiss the conspiracy indictment against her on grounds of double jeopardy. The cases were consolidated. We affirm the convictions of perjury and attempted perjury. We conclude that the indictment charging conspiracy to murder should be dismissed on double jeopardy grounds.

I. *Facts and procedural history.* The basic facts, which we will supplement as necessary in our discussion below, are as follows. On March 6, 1993, the body of Robert D'Amour was discovered in his home in South Hadley. The cause of death was multiple gunshot wounds. An investigation, conducted by the crime prevention and control unit of the Massachusetts State police (CPAC), ensued. The police immediately obtained a search warrant for the home shared by the victim and the defendant, the victim's wife. Evidence uncovered during this search, including a letter from the defendant to one Alex Rankins, led the police to identify the defendant and Rankins as suspects.[2] After investigation, the prosecutor believed that the defendant and Rankins murdered the victim to procure insurance proceeds. Hoping to secure incriminating discussions between the two suspects, the prosecutor secured an authorization to wiretap several of the defendant's telephones. The prosecutor also subpoenaed the defendant and Rankins to testify before a grand jury investigating the murder. When the defendant testified before the grand jury pursuant to her subpoena, she made two false statements regarding her communications with Rankins. She had not been informed that she was a target of the investigation.

The defendant was indicted for murder, conspiracy to commit murder, perjury, and attempting to procure perjury. A petit jury acquitted the defendant of murder, tried on the theory that she hired Rankins to kill her husband. The jury convicted her of two counts of perjury and one count of attempting to incite perjury.

Following her acquittal on the murder charge, the defendant moved to dismiss the conspiracy indictment on double jeopardy grounds. The judge denied her motion. Pursuant to G. L. c. 211, § 3, the defendant then filed a petition with a single justice of this court seeking an interlocutory appeal of the denial of her motion to dismiss. See *Jones* v. *Commonwealth*, 379 Mass. 607, 615 (1980). The single justice reserved and reported the petition to the full bench. The direct and interlocutory appeals were consolidated.

The defendant makes several arguments on direct appeal. She challenges (1) the search and seizure of a letter from her to Rankins; (2) the evidence gathered through the wiretap; (3) the

---

[2]Alex Rankins was convicted of murder in the first degree of Robert D'Amour. His appeal is pending.

lack of a target warning prior to her grand jury testimony; (4) the evidence regarding the materiality of her perjury and the jury instruction on materiality; and (5) her sentence. We hold that there was no reversible error. The defendant's argument on interlocutory appeal is that the conspiracy indictment places her in double jeopardy. We agree.

II. *Search warrant.* The first of the defendant's challenges concerns the motion judge's refusal to suppress a letter. She asserts that the warrant authorizing the search of her home lacked probable cause and was overbroad. The defendant alternatively argues that the seized letter was not within the scope of the warrant and was not in plain view. On the view we take of this case, we need not determine whether the challenged provision of the warrant was proper. We conclude that unchallenged portions of the warrant supported the scope of the search and that the letter was in plain view.

A State trooper applied for a search warrant of the home the defendant shared with the victim. In his affidavit in support of his application, the trooper stated that, although guns were found in the same room as the victim, no gun was found immediately around the body and that there was no sign of a forced entry. In addition to the guns in the living room, there were guns in a cabinet in the basement. The trooper concluded that the victim had been murdered and that it was "possible that the assailant was known to the victim." He requested authorization to seize, among other things, "firearms and ammunition," "writings relating to the ownership of firearms," and "writings containing the names of persons known to the deceased such as address books, diaries and appointment books or calendars."[3] A warrant issued. During the course of the search, an officer discovered some ammunition and a letter from the defendant to the victim regarding the ownership of a gun found near the victim. Along with these items, the officer found a letter from "Susie" to "My dearest Alex" professing love for "Alex" and hatred for the victim. The second letter led the police and the prosecutor to suspect the defendant was involved in the murder

---

[3]In its entirety, the warrant authorized a search for "firearms and ammunition, shell casings and bullet heads, writings relating to the ownership of firearms, objects bearing fingerprints, palmprints, footprints, shoeprints, trace evidence including blood, saliva, hair, physiological fluids and secretions, clothing, fibers, dirt, dust, and soil and to conduct tests at the premises to locate such evidence, writings containing the names of persons known to the deceased such as address books, diaries and appointment books or calendars."

of her husband and to apply for the wiretap that supported the perjury convictions. The motion judge denied the defendant's motion to suppress the letter.

1. *Sufficiency of the warrant.* The defendant challenges the provision authorizing seizure of "writings containing the names of persons known to the deceased." She argues that the seizure of the letter was not justified by this provision because the application failed to establish probable cause that the writings sought were related to the criminal activity under investigation. *Commonwealth* v. *Cefalo*, 381 Mass. 319, 328 (1980). The defendant urges that a warrant for all papers identifying persons known to the victim invited a general, unreasonable rummaging in and reading of her private papers. *Coolidge* v. *New Hampshire*, 403 U.S. 443, 467 (1971). In addition to Federal grounds, the defendant bases her argument on art. 14[4] of the Massachusetts Declaration of Rights and G. L. c. 276, § 1, which, according to the defendant, nowhere authorizes a search for "mere evidence."

The motion judge determined that the trooper's application for the search warrant set forth sufficient information to establish probable cause to search for "writings containing the names of persons known to the deceased." Noting that a murder had occurred and that there were no signs of a forced entry, the judge credited the trooper's belief that it was "possible" that the victim knew his assailant. The judge also held that the common law allowed for the seizure of "mere evidence," and thus permitted a search for writings. *Matter of Lavigne*, 418 Mass. 831, 835 (1994).

We begin with G. L. c. 276, § 1. Broadly speaking, this statute permits a magistrate to issue a warrant authorizing the search for specific property, including fruits, instrumentalities, and "property or articles . . . which . . . have been used, as a means or instrumentality of committing a crime"[5] There is merit to the defendant's argument that "writings containing the

---

[4]The defendant made no specific claim in her motion to suppress that the search violated rights guaranteed by art. 14. Thus she may not raise that argument for the first time on appeal. See *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 (1987); *Commonwealth* v. *Lett*, 393 Mass. 141, 144 (1984).

[5]The relevant portions of the statute provide for the search of "property or articles stolen, embezzled or obtained by false pretenses, or otherwise obtained in the commission of a crime"; "property or articles which are intended for use, or which are or have been used, as a means or instrumentaility of committing a crime"; and "property or articles the possession or control of which

names of persons known to the deceased" fall within none of these categories. The Commonwealth concedes as much, arguing instead that the seizure of the evidence is permitted by the common law.[6] However, we need not decide whether seizure of "writings containing the names of persons known to the deceased" is permitted by the text of G. L. c. 276, § 1, or by the common law. The warrant authorized the search for "ammunition" and for "writings relating to the ownership of firearms." The inclusion of these items in the warrant is not challenged by the defendant. Even if the challenged provision of the warrant were improper, the remaining unchallenged provisions permit the seizure of the letter.[7] See *Commonwealth* v. *Lett*, 393 Mass. 141, 144-145 (1984) (holding that infirmity of part of a warrant does not require suppression of anything described in valid portions or lawfully seized pursuant thereto). See also *United States* v. *Morris,* 977 F.2d 677, 682 (1st Cir.), cert. denied, 507 U.S. 988 (1993); *United States* v. *Diaz,* 841 F.2d 1, 4 (1st Cir. 1988); *United States* v. *Riggs,* 690 F.2d 298, 300-301 (1st Cir. 1982).

2. *Plain view doctrine.* The objects seized pursuant to the unchallenged warrant provisions must fall within the scope of these provisions or a warrant exception. The letter is not within the scope of the unchallenged provisions.[8] It is clearly not ammunition, nor does it discuss the ownership of firearms. However, we agree with the motion judge that the letter falls within a warrant exception. It was in plain view.

"Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a

---

is unlawful, or which are possessed or controlled for an unlawful purpose . . . ."

[6]General Laws c. 276, § 1, provides this exception, stating that "[n]othing in this section shall be construed to abrogate, impair or limit powers of search and seizure granted under other provisions of the General Laws or under the common law."

[7]The defendant correctly did not challenge the probable cause or particularity requirements of the remaining portions of the warrant which clearly met the standards of G. L. c. 276, §§ 1, 2.

[8]Focusing only on the part of the warrant permitting the search for "writings containing the names of persons known to the deceased," the motion judge also found that the "My dearest Alex" letter was not within the scope of the warrant.

warrant." *Commonwealth* v. *Santana*, 420 Mass. 205, 211 (1995), and cases cited. Our cases also have required that the police come across the item inadvertently.[9] *Id.* In the case of contraband and fruits and instrumentalities of crime, the nexus to criminal activity is obvious. *Commonwealth* v. *Accaputo*, 380 Mass. 435, 447 (1980). "Mere evidence," on the other hand, may be seized only if the officers recognize it as plausibly related to criminal activity of which they already were aware. *Id. Commonwealth* v. *Bond*, 375 Mass. 201, 206 (1978).

The police are lawfully in a position from which they view an object if they did not violate the Fourth Amendment to the United States Constitution in arriving there. *United States* v. *Menon*, 24 F.3d 550, 559 (3d Cir. 1994). All that was required to justify the presence of the police in the defendant's home was a valid search warrant.

An executing officer has a lawful right of access to the object seized if the terms of the warrant entitle him to search where the object is found. *Id.* at 563. Here, the "My dearest Alex" letter was found in the master bedroom with some ammunition and the letter from the defendant to the victim discussing the ownership of a gun. These other items seized with the "My dearest Alex" letter indicate that the police had a lawful right of access. The unchallenged portions of the warrant authorized the seizure of ammunition as well as writings related to the ownership of firearms. The police therefore were entitled to search any container that "could conceal items of the kind portrayed in the warrant." *United States* v. *Gray*, 814 F.2d 49, 51 (1st Cir. 1987). The officer thus had "a right to be where he was, looking at what he was looking at, when he came across" the letter. *United States* v. *Rutkowski*, 877 F.2d 139, 141 (1st Cir. 1989).

Once the officer came across the letter, he was permitted to examine it "cursorily" to determine whether it was a writing relating to the ownership of firearms. *Andresen* v. *Maryland*, 427 U.S. 463, 482 n.11 (1976). See *Menon, supra* at 563 (officer entitled to look at documents carefully enough to determine whether they were within scope of warrant); *State* v. *Andrei*, 574 A.2d 295, 298 (Me. 1990) (officer's examination of four lines of a diary "revealed no more than what was exposed to

[9]The Supreme Court has rejected this requirement. *Horton* v. *California*, 496 U.S. 128, 130 (1990). We have not considered whether to retain it, and the issue is not raised by the parties here. *Commonwealth* v. *Santana*, 420 Mass. 205, 211 & n.6 (1995).

plain view"). When the police "scanned" the letter, the motion judge found that "it became immediately apparent that they stumbled on evidence of a motive on the part of the defendant for killing her husband: professed love for another and hatred of the deceased." This determination supports the conclusion that the officers recognized the letter as related to the murder.

Finally, the discovery of the letter was inadvertent. We have described the inadvertence element of the plain view doctrine as requiring "that police lack[] probable cause before entering the room to believe the items would be there." *Commonwealth* v. *Cefalo*, 381 Mass. 319, 331 (1980). "The inadvertence requirement simply lends credibility to the doctrine by ensuring that only evidence which the police did not anticipate or know to be at the locus of a search will be seized without a warrant." *Commonwealth* v. *Moynihan*, 376 Mass. 468, 473 (1978), quoting *Commonwealth* v. *Walker*, 370 Mass. 548, 557, cert. denied, 429 U.S. 943 (1976).

There was no evidence to suggest that the police suspected the defendant in the murder of her husband at the time they obtained the warrant. Thus, the police could not have anticipated the discovery of the letter. As the letter was discovered in plain view during the course of a validly authorized search, the motion judge properly denied the defendant's motion to suppress.

III. *Wiretap evidence.* The defendant next challenges the denial of her motion to suppress evidence obtained from a wiretap of three telephones under her control. The motion judge found the following facts with regard to the electronic surveillance. In January, 1994, the district attorney signed a letter authorizing an assistant district attorney to apply for a wiretap warrant pursuant to G. L. c. 272, § 99. The assistant district attorney submitted an application, along with affidavits from two State troopers, to a judge who found that the documents gave probable cause to believe that the defendant and Rankins with "divers and other persons whose names are presently unknown in a continuing conspiracy among this highly organized and disciplined group" to procure and distribute fraudulently obtained life insurance proceeds. The issuing judge authorized the interception of telephones located at two of the defendant's residences and a cellular phone under her control.

In February, 1994, the district attorney signed a letter authorizing the assistant district attorney to apply for a warrant to intercept wire and oral communications and "renewals

thereof." That day, the assistant district attorney submitted an application for a renewal of the warrant. Renewal was granted. Less than two weeks later, the assistant district attorney again successfully applied for renewal. After the order and warrant terminated, the recordings were delivered to the judge as described below.

The defendant unsuccessfully moved to suppress the wiretap evidence. The evidence was subsequently used to prosecute her for perjury. The defendant now appeals the denial of her motion to suppress. For the reasons stated below, we conclude that the judge correctly denied the motion to suppress.

1. *Sufficiency of the district attorney's authorization to apply for a warrant for a wiretap.* The defendant argues that the district attorney's authorization of an assistant district attorney to seek a wiretap warrant was insufficient. The ability to perform electronic surveillance in Massachusetts is governed in detail by G. L. c. 272, § 99, and our decision in *Commonwealth* v. *Vitello*, 367 Mass. 224 (1975). In that decision, we interpreted the Massachusetts statute so as to comply with the Federal restrictions on electronic surveillance. 18 U.S.C. §§ 2510-2520 (1994) (Title III).

In *Vitello*, we said that a district attorney may authorize an assistant to apply for a wiretap warrant after giving "full and fair review of the grounds asserted for seeking a wiretap warrant. Special designation to the . . . assistant district attorneys must be on a case by case basis only. Authority to apply for each wiretap warrant must be specifically granted in writing by the . . . district attorney." *Vitello, supra* at 232. We added that "an assistant district attorney may not apply at will for wiretap orders but must bring the matter for examination before . . . the district attorney. . . . [T]he district attorney is to determine whether a particular proposed use of electronic surveillance would be consistent with the overall policy in respect to monitoring followed in his jurisdiction, and to this end the respective attorney must review and authorize each such application in writing." *Vitello, supra* at 256. Because the district attorney's authorization complied with the requirements of *Vitello*, the wiretap warrant was valid.

The defendant challenges the authorization on several bases. The defendant first argues that the letter authorizing the assistant district attorney to obtain a warrant was overbroad, allowing the assistant district attorney to obtain numerous wiretaps

without further review from the district attorney.[10] However, the authorization, on its face, is limited to the investigation of "the murder of [the defendant's husband] and related matters including the fraudulent receipt and larceny of life insurance proceeds." As the authorization states that the murder and the life insurance fraud were "related matters," the assistant district attorney's power was confined to seek wiretaps on the limited class of people who could have participated in the murder and the related insurance crimes. Because the defendant was the sole beneficiary of the life insurance policies, the assistant district attorney was not vested with unfettered power. The scope of the authorization was limited sufficiently.

The defendant also argues that the authorization did not indicate that the district attorney fully examined or considered the application. We disagree. The district attorney, subject to public accountability, accepted responsibility for the application through the authorization letter. See *Vitello, supra* at 256. See also *United States* v. *O'Malley,* 764 F.2d 38, 41 (1st Cir. 1985), and cases cited. Once it is established that the district attorney authorized the application (after reviewing the application as required by *Vitello*), her authorization is not subject to further judicial review. See *United States* v. *O'Malley, supra* at 41, and cases cited (discussing authorization by an assistant attorney general pursuant to Title III). Here, there is ample evidence that the district attorney properly reviewed the application and the defendant offers no evidence to the contrary.[11] The district attorney's familiarity with the case was indicated by the description of life insurance fraud and larceny in the authorization letter. Indeed, the authorization and the application were bound

[10]The signed authorization read as follows: "I, Elizabeth A. Scheibel, District Attorney for the Northwestern District, specially designate Assistant District Attorney David S. Ross and First Assistant District Attorney David A. Angier of the Northwestern District to apply ex parte to a judge of competent jurisdiction for a warrant to intercept wire or oral communications pursuant to Section 99 of Chapter 272 of the General Laws in connection with the investigation of the murder of Robert P. D'Amour and related matters including the fraudulent receipt and larceny of life insurance proceeds, and each to perform all acts in connection with said application and warrant including the filing of amended or renewal applications to the same extent as the District Attorney is empowered to do so."

[11]In denying the motion to suppress, the judge found that the district attorney's "designation letter contain[ed] sufficient representation of the requisite case by case review, especially in the absence of any evidence to the contrary."

together and shared the same date, suggesting that the district attorney was familiar with the content of the application when she signed the authorization.

The defendant also complains that the district attorney did not cosign the warrant application. In *Vitello*, we indicated that "the better procedure" would be for the district attorney to co-sign the warrant. *Id.* at 232. However, as the language of *Vitello* clearly indicates, there is no requirement that the district attorney cosign the letter. Rather, it is a preferred practice. See *United States* v. *Smith*, 726 F.2d 852, 859 (1st Cir.), cert. denied sub nom. *Torres* v. *United States*, 469 U.S. 841 (1984).

The defendant also argues that there was insufficient authorization for renewals. The argument is premised on the theory that a renewal itself is an application. Therefore, under the dictates of *Vitello*, *supra* at 232, 257, the district attorney was required to "review and authorize" the renewal in writing.[12] However, neither the wiretap statute nor *Vitello* requires written authorization for renewals.[13]

2. *Probable cause to believe the offenses were committed in "connection with organized crime."* The defendant also argues that, at the time of the application for a warrant, there was no probable cause to believe that she committed crimes in "connection with organized crime." A wiretap warrant may only be issued on "probable cause to believe that a designated offense has been, is being, or is about to be committed and that interception would lead to evidence of that offense." *Commonwealth* v. *Thorpe*, 384 Mass. 271, 275 n.3, cert. denied, 454 U.S. 1147 (1982), citing G. L. c. 272, § 99 E 2. A "designated offense" includes a group of certain offenses carried out "in connection with organized crime," defined as "a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." G. L. c. 272, §§ 99 A, B 7. See *Thorpe*, *supra* at 277, 279. That definition is not limited to activities which constitute "a grave danger to the public welfare and safety, [or] brutal and violent tactics, [or demon-

---

[12]The assistant district attorney sought two renewals for the wiretap warrant. The first renewal application was accompanied by an authorization letter nearly identical to the original authorization letter, although the first sentence was altered to include the words "and renewal warrants." There was no written authorization letter for the second renewal.

[13]Although the statute specifies in detail the procedure for renewal, there is no mention of a written authorization requirement. G. L. c. 272, § 99 J 1.

strate] that legitimate business activities were . . . infiltrated" (internal quotations omitted). *Thorpe, supra* at 277. Moreover, the class of people subject to wiretaps includes more than "full-time professional criminals." *Id.* at 277 n.6.

"It is not our province to engage in *de novo* review of an application [for a wiretap warrant]; instead we 'test it in a practical and common sense manner' to determine whether the facts [the application] sets forth are 'minimally adequate' to support the findings made by the issuing judge." *Smith, supra* at 864, and cases cited. The motion judge found the application supported the conclusion that there was probable cause to believe the crimes were committed in connection with organized crime. We agree.

The judge noted that the warrant application contained the following information. The victim had been shot on a previous occasion, immediately after he purchased life insurance at the defendant's request. The defendant failed to disclose a relationship and series of telephone calls with Rankins. Rankins traveled from Louisiana to Springfield at the time of both attacks on the victim. The defendant left her home on the day of the murder, traveling to Cape Cod immediately prior to a severe storm. Rankins increased his spending patterns after the defendant received insurance proceeds. The judge noted that the evidence allowed the conclusion that the victim was murdered for insurance proceeds. The crime scene indicated that the victim knew the murderer and that it was likely that there was a third party involved in the murder.[14] The defendant took steps that could be perceived as an effort to establish an alibi, including repeated calls to the home answering machine. The defendant provided bail money for Rankins on an unrelated matter, while he was a suspect in the murder of her husband. We agree with

---

[14]The defendant argues that there was insufficient evidence to establish probable cause to believe that a third party was involved. The warrant application stated that the police believed a third party picked up Alex Rankins at the victim's home after he killed the victim. The defendant suggests that there were other possible explanations how Rankins left the crime scene and that no third party was ever implicated in the murder or insurance crimes. However, at the time the warrant application was submitted, the issuing judge had no evidence of these other possibilities. When evaluating a warrant application, we examine whether there was evidence of organized crime before the surveillance. We do not superimpose information gleaned through the subsequent wiretap and investigation. See *Commonwealth* v. *Thorpe*, 384 Mass. 271, 278, cert. denied, 454 U.S. 1147 (1982).

the judge that, at the time of the application for the warrant, "[t]he combined weight of this information warrant[ed] a reasonable belief that the murder required the organization and discipline of the two prime suspects and perhaps others, who necessarily had to maintain that discipline and organization in order to obtain and make use of the insurance proceeds."

The defendant suggests that such reasoning would allow the use of a wiretap whenever two or more parties coordinated efforts to commit a crime, including a "garden-variety burglary." We disagree with that contention.

We have recognized before this distinction between more "garden-variety" criminal activity, where wiretapping is impermissible, and crimes requiring the high degree of discipline and organization of organized crime. In *Commonwealth* v. *Lykus*, 406 Mass. 135 (1989), we stated that a kidnap ransom note referring to the kidnappers as "we" and demonstrating knowledge that the parents had called the police supported a reasonable suspicion of organized crime under § 99 B 4. There, a wiretap was appropriate because the police "lacked . . . a clear picture of the players involved in the kidnapping. . . . [M]ore evidence to the contrary would have been necessary to make clear to the police that no organized crime connection reasonably could have been suspected." *Id.* at 142 & n.10. We contrast *Commonwealth* v. *Jarabek*, 384 Mass. 293 (1981), where we concluded that evidence that a school committee member and an assistant superintendent were involved in a $2,000 kickback scheme did not support a reasonable suspicion of organized crime under § 99 B 4.

Here, as in *Lykus*, the investigating officer lacked a clear picture of the parties involved in the criminal activity.

The application also indicated that prior to the murder, the defendant and Rankins organized alibis and an escape, possibly involving others. After the murder, the defendant provided bail money for Rankins. Such teamwork required more than mere coordinated efforts of "garden-variety" cofelons. In light of these circumstances as they appeared at the time of the wiretap warrant application, "more evidence to the contrary would have been necessary to make clear to the police that no organized crime connection reasonably could be suspected." *Lykus*, *supra* at 142 n.10.

3. *"Sworn" application.* The defendant argues that the assistant district attorney's failure to swear properly to the wiretap

application requires the suppression of all evidence obtained therefrom. We disagree.

General Laws c. 272, § 99 F 1, provides that "each application ex parte for a warrant must be in writing, subscribed and sworn to by the applicant. . . ." Section 99 B 14 defines "sworn," as it appears in the wiretap statute, as "an oath or affirmation or a statement subscribed to under the pains and penalty of perjury." Therefore, any application for a search warrant "sworn" to under § 99 F 1 is by the express language of the statute, an oath, an affirmation, or a statement subscribed to under the pains and penalty of perjury.

The signed application for a warrant stated, "I, David S. Ross, Assistant District Attorney for the Northwestern District . . . being duly sworn, depose and say . . . ." This statement identified the party responsible for the application and swore to its veracity in compliance with the statute. Indeed, by stating that he was "sworn," the assistant district attorney placed both his professional reputation and license behind the application. The statute does not require a jurat or a formal swearing or oath before the court, as the defendant contends.[15]

4. *Sealed return.* The defendant argues that the wiretap evidence should be suppressed because the Commonwealth failed to adhere to the sealing provisions of 18 U.S.C. § 2518(8)(a) and G. L. c. 272, § 99 M. The defendant contends that the Supreme Court mandated exclusion of wiretap evidence for delays in sealing the fruit of the wiretap warrants under Title III. See *United States* v. *Ojeda Rios*, 495 U.S. 257, 264 (1990). Under Federal law, delayed sealing is grounds for suppression unless the government produces an objectively reasonable explanation for the delay. See *id.* at 265-266. Because the Commonwealth's requirements for sealing stem in part from Federal law, see *Commonwealth* v. *Vitello*, 367 Mass. 224, 233 (1975), the defendant also argues that suppression is warranted for violations of the State sealing procedures when there is no reasonable explanation for the delay. Under the State procedure, "the return [of wiretap evidence] is to be made to the issuing judge as soon as possible following the termination of the

---

[15]The same analysis applies to the defendant's contention that the application violated 18 U.S.C. § 2518(1), requiring that each application "shall be made upon oath or affirmation to a judge of competent jurisdiction." Because of the import of the assistant district attorney's statement that he was "sworn," the application sufficiently complied with the statute.

interception and at the latest within seven days thereafter." *Vi-tello, supra* at 233.[16] Here, the defendant contends, there was a delay without a reasonable explanation and suppression is warranted. We disagree.

In denying the motion to suppress, the judge found the following facts. Each night after recording, the original cassettes and a copy were individually sealed. The wiretap recording ended on a Friday before a long weekend. Over the weekend, the surveilling officers placed the sealed envelopes containing the tapes in a "banker's box" and sealed the box with duct tape and blue evidence tape. The box was transported to the CPAC office and locked in an evidence locker. One of the surveilling officers kept the only key to the locker. On the Tuesday after the long weekend, the assistant district attorney completed and signed the return. That afternoon, he and the officer drove to the courthouse to deliver the sealed box and the return documents to the presiding judge at the Franklin Superior Court, but the judge had already left for the day. The evidence was returned to the CPAC locker. The next morning, the assistant district attorney and the officer met with the judge and submitted the return and a proposed order confirming the judge's examination and ordering the transfer of the return to the Chief Justice of the Superior Court. The judge informed the assistant district attorney that other necessary materials were being stored at the Hampshire Superior Court and ordered the assistant district attorney and the officer to store the evidence in the CPAC locker and return with it one week later. On the date designated by the

[16]General Laws c. 272, § 99 M, provides: "Within seven days after termination of the warrant or the last renewal thereof, a return must be made thereon to the judge issuing the warrant by the applicant therefor, containing the following:

"*a.* a statement of the nature and location of the communications facilities, if any, and premise or places where the interceptions were made; and

"*b.* the periods of time during which such interceptions were made; and

"*c.* the names of the parties to the communications intercepted if known; and

"*d.* the original recording of the oral or wire communications intercepted, if any; and

"*e.* a statement attested under the pains and penalties of perjury by each person who heard oral or wire communications as a result of the interception authorized by the warrant, which were not recorded, stating everything that was overheard to the best of his recollection at the time of the execution of the statement."

judge, the officer brought the sealed box to the judge and offered to open it for the judge's inspection. The judge declined. The judge then signed a sealed envelope containing the other materials required in the return, back dating it by one day. The officer brought all of the materials back to CPAC, and locked them in the evidence locker. The next day, he and another officer transported the materials to the office of the Chief Justice of the Superior Court in Boston.

We agree with the judge's conclusion that the explanation for the delay was satisfactory. When examining a delay for reasonableness, courts should examine a number of factors including whether there is evidence that the tapes have been compromised, whether the delay was caused by bad faith, whether the delay benefitted the government or gave the government a tactical advantage, and finally the length and cause of the delay. See *United States* v. *Mora*, 821 F.2d 860, 867-869 (1st Cir. 1987). In light of the factual findings described above, the judge's conclusion that the explanation for the delay was "satisfactory," is sufficiently supported. We note at the outset that the defendant does not suggest that she was prejudiced by the delay[17] or that the delay gave the government an unfair tactical advantage. There is no evidence that the assistant district attorney acted in bad faith. He attempted to return the recordings to the judge immediately after a long weekend and was stymied by the judge's absence and order to return later with the tapes. Delay in such circumstances does not warrant suppression. See *Mora, supra* at 870 (negligent, honest, unintentional mistake did not warrant suppression). In light of the long weekend and the judge's order, the delay was not unreasonable. See *United States* v. *Wong*, 40 F.3d 1347, 1375 (2d Cir. 1994), cert. denied, 516 U.S. 870 (1995) (noting that weekends and holidays present a legitimate obstacle to the sealing of tapes); *United States* v. *Pitora*, 5 F.3d 624, 627 (2d Cir. 1993), cert. denied, 510 U.S. 1131 (1994) (two- to five-day delay excused where there was a governmental error in calculating the expiration date and the government believed that it was not necessary to communicate with the judge over the weekend); *Mora, supra* at 870, and cases cited (stating that gaps of twenty and forty-one days before sealing were not so great as to require automatic exclusion and

---

[17]Under *United States* v. *Mora*, 821 F.2d 860, 867 (1st Cir. 1987), the burden is on the government to prove that the tapes are unadulterated. Absent an allegation to the contrary, that burden is satisfied.

recognizing that comparable periods have survived appellate scrutiny where the recordings remained unadulterated).

The defendant also contends that the judge's failure to examine personally the condition of the original recordings warrants suppression. Title III requires that recordings be "made available to the judge and sealed under his direction." 18 U.S.C. 2518(8)(a). The motion judge found that each day, the recordings were sealed in accordance with the judge's order.[18] There is no support for the contention that the judge's decision not to open and reseal the packages personally violates Title III.

The defendant also challenges the judge's actions under § 99 and under *Vitello*. In *Vitello*, we said that "[a]fter examining the return, including the condition of the original recordings," the judge is to seal the recordings. See *id.* at 233. However, we also stated that where there is uncertainty about whether the judge examined the original recordings, it is sufficient that the judge "could have, if he deemed it necessary, broken the seal . . . , examined the tapes and resealed the containers holding the tapes." See *id.* at 277. Here, the judge had the opportunity to open the sealed containers and examine the recordings but chose not to do so. Suppression thus is not warranted.

IV. *Target warning.* The defendant argues that she was entitled to notification from the prosecutor that she was a potential defendant before she testified before the grand jury. After the defendant and Rankins became suspects in the murder of the victim, the assistant district attorney applied for and was granted a warrant to intercept the defendant's telephone conversations. The assistant district attorney believed that communications necessary to providing evidence in the case would occur once the defendant was served.

The defendant was sworn before the grand jury and the district attorney explained to the defendant that the purpose of the testimony was to assist the grand jury in determining the

---

[18]The judge ordered: "Upon conclusion of the monitoring and recording on each day on which this warrant is being executed, the original tapes of the matters recorded are to be sealed by the law enforcement officials executing this warrant. Said sealing shall take place upon completion of a working copy of the tapes. The sealing shall include physical sealing of the tapes, together with the sealing officer's initials and the date upon which the tapes were sealed. Said sealed tapes are to then remain in the custody of law enforcement officials designated to execute this warrant until such time as it is appropriate that they be delivered to me for delivery to the Chief Justice's office."

facts and circumstances surrounding her husband's death.[19] The defendant was then told that she had the right to remain silent and to refuse to answer any questions if a truthful answer might tend to be incriminating. She was warned that anything she said might be used against her in a court of law, and that she had the right to representation by an attorney. The defendant was also told that she had a right to consult with an attorney during the proceedings. The defendant indicated that she understood her rights, that she was previously unaware of her right to counsel, but that she "didn't really feel" she needed counsel. The assistant district attorney reassured her of her rights, told her counsel could be provided by the Commonwealth, and that she was free to change her mind about testifying at any time. The defendant proceeded to make statements which formed the basis of her perjury conviction.

The defendant argues that she had a right to be warned that she was a potential defendant prior to testifying before the grand jury under art. 12 of the Massachusetts Declaration of Rights.[20] The defendant relies on *Commonwealth* v. *Gilliard*, 36 Mass. App. Ct. 183 (1994), where the defendant made a similar claim. There, the court noted that "[a] person appearing before the grand jury, particularly one who feels he is innocent of the crime being investigated, may well be unaware that he has been targeted for possible prosecution and may not fully understand the implications of freely giving sworn testimony." *Id.* at 188. The defendant argues that in the absence of a target warning, she was lulled into a false sense of security by the prosecutor's

---

[19]The defendant was told that the grand jury wanted to know "who had a motive to kill [her] husband, to explore who his enemies were, motives often like financial dealings. So I will be asking [the defendant] questions about [the victim's] finances, his employment and income, and the people who had business dealings with him. I will also ask [the defendant] later to help us, if [she could], to share with the [g]rand [j]ury any suspicions or theories about what has happened that [she] may have. I know that [the defendant] discussed some of these issues with the police already."

[20]Target warnings are not required under the Fifth Amendment to the United States Constitution. *United States* v. *Washington*, 431 U.S. 181, 188 (1977). (We note that the United States Department of Justice, however, requires that grand jury targets receive warning as a matter of policy. See *Commonwealth* v. *Gilliard*, 36 Mass. App. Ct. 183, 188 [1994].) The defendant premises her argument on our cases holding that art. 12 of the Massachusetts Declaration of Rights "requires a broader interpretation [of the privilege against self incrimination] than that of the Fifth Amendment." *Attorney Gen.* v. *Colleton*, 387 Mass. 790, 796 (1982).

description of the purpose of her testimony. Therefore, the defendant lacked the ability to make a knowing and intelligent waiver of her right not to contribute to her own indictment.

Target warnings are not required as a matter of Federal law. Cf. *United States* v. *Washington*, 431 U.S. 181, 192 (1977) (Brennan, J., dissenting). A grand jury witness has the option to tell the truth or to remain silent. He or she does not have the option to lie. A witness's options are not altered by a target warning. "[T]he prospect of being indicted does not entitle a witness to commit perjury." *Washington, supra* at 189. We are not inclined to require target warnings as a matter of policy under State law.

The motion judge found that the defendant was informed of her right to remain silent, her right to an attorney, and the fact that her testimony could be used against her. He further found that her recorded conversations showed she fully understood the ramifications of her testimony. There was no error. The defendant's statements before the grand jury were given freely and thus properly admitted. See *Washington, supra* at 188 ("it seems self-evident that one who is told he is free to refuse to answer questions is in a curious position to later complain that his answers were compelled").

V. *Materiality.*

1. *Sufficiency of the evidence.* The defendant contests the trial judge's denial of her motion for a required finding of not guilty on the two perjury indictments. She argues that the evidence the Commonwealth offered to prove materiality was insufficient as a matter of law. We disagree.

Three days after the prosecutor obtained a warrant and order permitting the wiretapping of the defendant's telephones, the defendant was served with a subpoena to testify before the grand jury. When the defendant appeared to testify, the grand jury had disbanded for the day, but the prosecutor asked her to tell Rankins, if he called, that a subpoena had been issued for him also. Rankins called the defendant. The defendant passed on the prosecutor's message, but agreed not to tell the prosecutor that she had done so. Rankins said he would call again and left a telephone number. Two days later, the defendant perjured herself when she testified before the grand jury that she had forgotten to tell Rankins about the outstanding subpoena. She also perjured herself when she testified that Rankins did not say that he would call back and that their conversation was cut off by static.

The defendant argues that her false statements to the grand jury were not "material to the issue or point in question." G. L. c. 268, § 1. According to the defendant, her misstatement regarding Rankins's grand jury subpoena was not material because the Commonwealth already knew from the wiretap that she had told Rankins about the subpoena. Similarly, the defendant views her lie about the quality of the telephone connection as immaterial because the wiretap had already revealed that the defendant had Rankins's telephone number and that they planned to talk again.

In reviewing a denial of a motion for a directed verdict, we assess "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). See *Commonwealth* v. *Borans*, 379 Mass. 117, 134 (1979). Applying this test, we conclude that there was sufficient evidence to permit the jury to find the defendant guilty of two indictments charging perjury.

The crime of perjury is committed when one "required to depose the truth in a judicial proceeding or in a proceeding in a course of justice, wilfully swears or affirms falsely in a matter material to the issue or point in question . . . ." G. L. c. 268, § 1. Our case law instructs that a false statement is material if it "tend[s] in reasonable degree to affect some aspect or result of the inquiry." *Commonwealth* v. *McDuffee*, 379 Mass. 353, 360 (1979), quoting *Commonwealth* v. *Giles*, 350 Mass. 102, 110 (1966).

The defendant's argument that her testimony could have no effect on the grand jury's determination because of the knowledge provided to the Commonwealth through the wiretap "misperceives the legal requirements regarding materiality . . . . Actual impediment of the investigation is not required." *Borans, supra* at 136, quoting *United States* v. *Abrams*, 568 F.2d 411, 421 (5th Cir.), cert. denied, 437 U.S. 903 (1978). See *Giles, supra* at 111 (test for materiality is not whether testimony did in fact influence pertinent determination, but whether it had a reasonable and natural tendency to do so). The fact that the prosecutor knew that the defendant was lying is irrelevant. Materiality refers to the natural effect or tendency on the grand jury's determination if the jurors had believed the defendant's

testimony. *Id.* at 136-137 (perjured testimony not immaterial even though other witnesses had already provided grand jury with sufficient basis for indictment).

Knowing that Rankins was the prime suspect in her husband's murder, the defendant lied about the true nature of her relationship with Rankins to hinder the investigation of the murder of her husband. Had the defendant's testimony been believed, the effect would have been to impede the grand jury.[21] Thus, her false statements were material to the grand jury's determination.

2. *Jury instructions.* The defendant asserts that the judge improperly charged the jury on the issue of materiality. The judge instructed the jury that "the Commonwealth must prove beyond a reasonable doubt that the [d]efendant's testimony was material to the issue before the [g]rand [j]ury on the issue of the murder or murderer of Robert D'Amour." Defense counsel objected, proffering the argument now echoed by the defendant that the court "invaded the province of the jury" because the evidence showed "a wide variety of issues" under consideration by the grand jury. The judge did not alter the charge.

If the evidence raised a question as to what the issue before the grand jury was, then the matter should have been submitted to the jury. *McDuffee, supra* at 367. There was no evidence at trial, however, that the grand jury investigated anything other than the murder of the victim. At the beginning of the defendant's testimony to the grand jury, which was read into the trial record, the prosecutor explained to her that the grand jury's "purpose is to participate in the investigation of your husband's murder."

The defendant contends that there were several topics before the grand jury, including her relationship with Rankins as well as the victim's finances, employment, income, and business dealings. All of these were avenues explored by the grand jury

---

[21]The defendant also argues that there was no nexus between her falsehoods and the scope of the grand jury's investigation. We disagree. The scope of the investigation included the nature of the relationship between the defendant and Rankins. The cases cited by the defendant are distinguishable. *Commonwealth* v. *Louis Constr. Co.*, 343 Mass. 600, 606-607 (1962) (false testimony on place of storage of tent immaterial because unrelated to investigation of awarding of dismantling contract); *Commonwealth* v. *Kelley*, 33 Mass. App. Ct. 934, 935 (1992) (defendant's testimony on purchase price of automobile immaterial to investigation of illegal towing activities); *Commonwealth* v. *Mitchell*, 15 Mass. App. Ct. 577, 581 (1983) (defendant's assertion of official marriage immaterial to drug trial).

in an effort to identify the killers and motive. In the absence of contrary evidence, it was appropriate to withdraw the issue from the jury's consideration. *Commonwealth* v. *Jones*, 372 Mass. 403, 410 (1977).

VI. *Sentencing.* The final matter raised by the defendant's direct appeal is her claim that the trial judge unlawfully considered the murder for which she was acquitted in exceeding the sentencing guidelines on the perjury charges. The defendant's argument primarily relies on the prosecutor's oral argument and on the judge's stated reasons for exceeding the guidelines. She asks us to vacate her sentence and remand for resentencing. There was no error.

The judge sentenced the defendant to two terms of from ten to twelve years, to be served concurrently, for the perjury convictions. This sentence is well within the statutory maximum of twenty years. G. L. c. 268, § 1. We do not review a lawful sentence. *Commonwealth* v. *Woodward*, 427 Mass. 659, 683 (1998). *Commonwealth* v. *Coleman*, 390 Mass. 797, 804 (1984). That authority is delegated to the Appellate Division of the Superior Court. G. L. c. 278, §§ 28A-28C. "However, this court may review the penalty imposed upon a defendant who has been sentenced for a crime other than that for which he stands convicted." *Coleman, supra.* See *Woodward, supra* at 684 n.40; *Commonwealth* v. *Franks*, 365 Mass. 74, 81 (1974).

The defendant argues that the prosecutor "goaded" the judge to factor the defendant's murder indictment into the sentence. The prosecutor opened his argument by painting the image of the victim being "gunned down in his home." He went on to intimate that the defendant lied to avoid being caught and punished. He also implied that the defendant was not a good mother for permitting her children to watch her murder trial.

Any effect of these statements on the judge was balanced by the remainder of the argument. Although it would have been better to omit all reference to conduct for which the defendant was acquitted, the prosecutor's oral argument did not rely on the murder indictment. *Commonwealth* v. *Goodwin*, 414 Mass. 88, 91 (1993). He related the murder indictment to the perjuries by noting that there are heightened penalties for perjury committed in the course of a capital case. He also stated that "no one should misinterpret [the recommended sentence] . . . as an attempt to punish the [d]efendant for the crime for which she was acquitted."

We need not decide the propriety of the prosecutor's oral argument at sentencing because there is no evidence that the judge was improperly influenced by it. The defendant urges us to presume that the murder indictment was a factor because the judge did not say that he did *not* consider it. We decline to do so. The judge stated that he imposed the sentence because the defendant knew that Rankins was suspected of murder, yet she calculatedly and deliberately committed perjury. He also noted that there were no mitigating circumstances. There is no basis for requiring a judge to list all the factors not considered. It is more than enough that he or she state the basis for the sentence imposed. "A judge has considerable latitude within the framework of the applicable statute to determine the appropriate individualized sentence." *Id.* at 92. There was no error.

VII. *Interlocutory appeal.* The defendant argues on interlocutory appeal that a trial on the charge of conspiracy would violate our common law rule barring a subsequent prosecution for the same offense. *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871). She also argues that a subsequent trial is barred by the double jeopardy clause of the Fifth Amendment to the United States Constitution.[22] We agree because, on the facts before us, conspiracy is a lesser included offense of accessory before the fact to murder.

It is well settled that, on its face, conspiracy is a separate and distinct crime from the substantive offense. See *Commonwealth* v. *Gallarelli*, 372 Mass. 573, 576-577 (1977); *Commonwealth* v. *French*, 357 Mass. 356, 393 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts*, 408 U.S. 936 (1972); *Commonwealth* v. *Stasiun*, 349 Mass. 38, 43-44 (1965). See *Pereira* v. *United States*, 347 U.S. 1, 11 (1953). Only if the substantive offense and the conspiracy are in actuality the same offense do trials for both constitute double jeopardy. To determine whether two offenses constitute the same offense, we examine whether each crime requires proof of an additional fact that the other does not. *Commonwealth* v. *Crocker*, 384 Mass.

---

[22]The double jeopardy clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, *Benton* v. *Maryland*, 395 U.S. 784 (1969), provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb . . . ." Our statutory law encompasses the same principle. General Laws c. 263, § 7, provides that "[a] person shall not be held to answer on a second indictment or complaint for a crime of which he has been acquitted upon the facts and merits; but he may plead such acquittal in bar of any subsequent prosecution for the same crime . . . ."

353, 357 (1981); *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306-307 (1972); *Morey* v. *Commonwealth, supra* at 434. See *Blockburger* v. *United States*, 284 U.S. 299, 304 (1932) (adopting this test for Federal offenses). Stated another way, "a prosecution for a greater offense precludes subsequent prosecutions for all its lesser included crimes." *Costarelli* v. *Commonwealth*, 374 Mass. 677, 683 (1978), citing *Jeffers* v. *United States*, 432 U.S. 137, 150-151 (1977). A lesser included offense is one which is necessarily accomplished on commission of the greater crime.[23] See *Salemme* v. *Commonwealth*, 370 Mass. 421, 424 (1976); *State* v. *Williams*, 395 A.2d 1158, 1167 (Me. 1978).

At the defendant's murder trial, the Commonwealth proceeded on the theory that the defendant was an accessory before the fact because she hired Rankins to kill her husband. The trial judge properly required the Commonwealth to prove that the defendant hired Rankins,[24] that they shared the intent to murder the victim, and that Rankins did in fact murder the victim. To prove that the defendant is guilty of the crime of conspiracy, the Commonwealth would have to show an unlawful agreement to further, by concerted action, the accomplishment of a criminal act. *Commonwealth* v. *Trung Chi Truong*, 34 Mass. App. Ct. 668, 672 (1993). "The heart of conspiracy is the formulation of the unlawful agreement or combination." *Attorney Gen.* v. *Tufts*, 239 Mass. 458, 493-494 (1921).

The plain meaning of "hiring" presupposes the existence of an agreement. It is impossible to hire someone to commit a crime without also forming an agreement. The person doing the hiring agrees to pay, while the person hired agrees to complete the crime. Thus, for a person to be an accessory before the fact to murder based on a hiring theory, intent to conspire to murder is required. In other words, a conspiracy is necessarily formed

---

[23]For example, the underlying felony is a lesser included offense of felony murder. Double jeopardy therefore prevents a defendant from being sentenced for both offenses. *Commonwealth* v. *Scott, ante* 362, 369 (1998); *Commonwealth* v. *Gunter*, 427 Mass. 259, 275 (1998); *Commonwealth* v. *Stewart*, 375 Mass. 380, 392-393 (1978). For additional examples of lesser included crimes, see *Costarelli* v. *Commonwealth*, 374 Mass. 677, 684 (1978) (use without authority and larceny), and *Kuklis* v. *Commonwealth*, 361 Mass. 302, 307 (1972) (possession of marihuana and possession of marihuana with intent to sell).

[24]This comports with G. L. c. 274, § 2, defining an accessory before the fact as one who counsels, hires or otherwise procures the commission of a felony.

when one hires another to commit a crime. The entire crime of conspiracy is subsumed by the crime of accessory before the fact to murder on a hiring theory, and the conspiracy requires no proof beyond that which is required for conviction of accessory before the fact to murder. Therefore, on the specific facts before us, conspiracy is a lesser included offense, and a subsequent trial on that charge is barred.[25] Cf. *Rutledge* v. *United States*, 517 U.S. 292, 300 (1996) (conspiracy is a lesser included offense of conducting a continuing criminal enterprise).

The Commonwealth argues that double jeopardy does not bar the defendant's prosecution for conspiracy because the defendant waived her double jeopardy rights. If a defendant expressly asks for separate trials on the greater and lesser offenses, trial on the subsequent charge is not barred. *Jeffers, supra* at 152. We conclude, however, that the situation here is quite different.

Rule 9 (e) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 842, 861 (1978), provides that an indictment for conspiracy shall not be tried simultaneously with an indictment for commission of the substantive offense unless the defendant moves for joinder. In a pretrial motion, the defendant stated that

[25]We note that other courts that have confronted this issue have concluded otherwise. In *State* v. *Spearin*, 477 A.3d 1147, 1158-1159 (Me. 1984), the defendant was indicted for being an accomplice and for conspiracy. The court held that the two did not merge. The court reasoned that an aiding and abetting theory of liability, even though not an issue in the case, would not encompass the crime of conspiracy, but acknowledged that an agreement could provide a basis for liability under both provisions. We agree that other theories of accessorial guilt, aside from hiring, do not presuppose the existence of an agreement. "The fact that the defendant may have aided and abetted the crime does not . . . establish a conspiracy . . . ." *Commonwealth* v. *Cook*, 10 Mass. App. Ct. 668, 672 (1980). See *Pereira* v. *United States*, 347 U.S. 1, 11 (1954). It is our opinion, however, that each theory of accessorial guilt must be examined separately to determine whether double jeopardy concerns arise. We also note that the law of Maine differs from that of the Commonwealth in that the law of Maine does not require the merger of felony murder and the underlying felony. See, e.g., *State* v. *Reardon*, 486 A.2d 112 (Me. 1984) (defendant convicted of robbery and murder where victim of robbery died of heart attack moments after robbery took place). Cases in Illinois and North Carolina similarly rely on the distinction between aiding and abetting on the one had and conspiracy on the other. See *People* v. *Stroner*, 96 Ill. 2d 204, 210-212 (1983); *State* v. *Looney*, 294 N.C. 1, 10-11 (1978). We therefore conclude that on these facts, the Commonwealth must prove an agreement and that agreement is the heart of both the conspiracy and accessory charges.

she did not consent to joinder. The Commonwealth attempts to construe the defendant's assertion of her rights as a waiver. The defendant's motion, however, merely indicated her acquiescence to the rule's requirement of separate trials. There was no waiver.

VIII. *Conclusion.* For the foregoing reasons, the defendant's perjury convictions and sentence are affirmed. The conspiracy indictment shall be dismissed.

*So ordered.*