**UNITED STATES of America, Appellee,**

v.

**Miguel MATIAS, Sr., Jose Caraballo, Miguel Matias, Jr., Frankie Matias, Luis Garcia, Defendants,**

**Miguel Matias, Sr., and Jose Caraballo, Defendants–Appellants.**

Nos. 1381, 1324, Dockets 87–1005, 87–1006.

United States Court of Appeals, Second Circuit.

Argued Aug. 11, 1987.

Decided Jan. 5, 1988.

Maurice H. Sercarz, Sercarz, Schechter & Lopez, Brooklyn, N.Y., for defendant-appellant Miguel Matias, Sr.

Norman Corenthal, New York City, for defendant-appellant Jose Caraballo.

Emily Berger, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., David V. Kirby, Debra D. Newman, Asst. U.S. Attys., of counsel), for appellee.

Before WINTER and MAHONEY, Circuit Judges, and STEWART,* District Judge.

WINTER, Circuit Judge:

Miguel Matias, Sr. and Jose Caraballo were convicted after a jury trial before Judge Wexler of conspiracy to manufacture and to possess cocaine hydrochloride in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1) (1982 & Supp. IV 1986), and possession with intent to distribute cocaine hydrochloride in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1) and 18 U.S.C. § 2

* The Hon. Charles E. Stewart, Jr., United States District Judge for the Southern District of New York, sitting by designation.

(1982). On appeal, they challenge the issuance and execution of a search warrant, the trial court's rulings on the admission and exclusion of co-defendants' statements and jury instructions on conscious avoidance and a defendant's motive to testify falsely.

Because we find that only the claim concerning the jury charge on a defendant's motive to testify falsely has merit, we affirm as to the nontestifying defendant, Caraballo, and reverse and remand as to Matias.

## BACKGROUND

After conducting surveillance of a house and barn in Central Islip between October 25 and October 29, 1985, Drug Enforcement Administration ("DEA") agents obtained a telephonic search warrant for those premises from a magistrate. When the DEA agents executed the warrant on November 1, they found a complete cocaine processing laboratory and about ten kilograms of cocaine in the barn. Various narcotics-related paraphernalia, a key to the barn, receipts for building materials, ownership records for the premises and some photographs were taken from the house.

While at the house, agents arrested Miguel Matias, Jr. and Frank Matias, the sons of defendant Miguel Matias, Sr., the record owner of the premises. Miguel Matias, Sr. and Caraballo were arrested later the same day. The four arrestees and Caraballo's employer, Luis Garcia, were charged in the two-count superseding indictment with conspiracy to manufacture and possess cocaine and possession with intent to distribute cocaine.

Garcia pled guilty, and the four remaining defendants were tried before Judge Wexler and a jury. After Judge Wexler dismissed the charges against Miguel Matias, Jr. and Frank Matias on sufficiency grounds, the jury convicted Jose Caraballo and Miguel Matias, Sr. on both counts. Judge Wexler sentenced each to concurrent terms of six years for each count and a $100 special assessment, to be followed by five years special parole for the possession count.

The evidence against Matias, Sr. showed that he and his family were longtime friends of Luis Garcia, who was also their commercial tenant in Brooklyn. When Garcia was arrested on drug charges in 1984, the Matiases pledged two of their houses to secure his bail. Matias was the record owner of the land upon which the barn housing the cocaine laboratory had been recently built. He and his wife testified, however, that this land had been sold to Garcia. During the construction of the barn, Matias, Sr. had purchased the building materials, including the plywood used to make a wall concealing the drug laboratory. He also helped unload ether barrels delivered by Caraballo.

Caraballo was Luis Garcia's employee. On October 25, 1985, Caraballo went to a chemical warehouse in Westchester to pick up fifty-five-gallon drums of ether, a solvent used to manufacture cocaine. He then drove from the warehouse to Luis Garcia's home in Westbury, and from there to the barn in Islip. During the trip, he stopped and acted furtively as though he were trying to elude anyone who might be following him. The next day, Caraballo drove Matias, Sr. to a lumberyard where the latter purchased the plywood used to make the wall concealing the drug manufacturing laboratory. On the afternoon of October 29, Caraballo left the barn and drove to a Kentucky Fried Chicken restaurant to get lunch for several persons working at the barn. A heavy smell of ether emanated from the barn, and after lunch Caraballo drove to a drugstore and bought a solution labeled "for red and irritated eyes." Caraballo's eyes looked red, irritated and watery, a condition caused by exposure to ether. Later in the afternoon, Caraballo drove to the town dump and disposed of some garbage. Included were numerous bottles of Pine Sol, an empty bottle of inositol with a heavy smell of ether inside, and thirteen $100 money wrappers. Inositol is commonly used to "cut" cocaine, and Pine Sol, a deodorizer, was later found in the cocaine laboratory.

## DISCUSSION

### A. *Search and Seizure Claims* [1]

■ In applying for the telephonic warrant, the Assistant United States Attorney recited to the magistrate facts relayed by DEA Agent Daniel McCarthy. McCarthy was on the line and confirmed at the close of the AUSA's presentation that those facts were "truthful to the best of [his] knowledge and belief." However, neither the AUSA nor Agent McCarthy was placed under oath or otherwise formally sworn.

It is argued that the warrant was invalid as violative both of the fourth amendment's command that warrants be supported by "oath or affirmation" and Fed.R. Crim.P. 41(c)(2)(D)'s requirement that the magistrate "immediately place under oath each person whose testimony forms a basis of the application and each person applying for that warrant." However, suppression in the instant case is not warranted because of the "good faith" exception to the exclusionary rule. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed. 2d 677 (1984); *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). Because the failure to put the agent formally under oath was obviously an oversight, the agents' reliance on the facially valid warrant was clearly reasonable under the circumstances, and this claim must be rejected.

The search warrant issued by the magistrate on October 29, 1985 authorized the seizure of the following:

(a) quantities of cocaine base and cocaine base [sic] and cocaine hydrochloride;

(b) various powders and dilutents used to mix cocaine;

(c) various chemicals used in the cocaine conversion process, including ether, acetone and hydrochloride [sic] acid;

(d) various equipment used in the laboratory conversion of cocaine, including fans, suction pumps, ovens, hoses and large rubber garbage cans;

(e) various narcotics-related paraphernalia, including baggies, scales and other items used to test and package cocaine;

(g) [sic] currency and other valuables used to purchase cocaine and/or reflect the proceeds of sales of cocaine;

(f) [sic] books and other records containing the names, addresses and/or telephone numbers of narcotics purchasers and/or suppliers, prices and quantities of narcotics sold and/or purchased, and/or other cash transactions, which books and records would reveal the identities of confederates in narcotics trafficking as well as the extent of their involvement.

Matias, Sr. argues that the execution of the warrant degenerated into a general, exploratory search and, therefore, that the entire fruits of the search must be suppressed. Alternatively, he argues that even if there were no general unrestricted search, certain documents and photographs seized must be suppressed as outside the scope of the warrant.

■ A search must be confined to the terms and limitations of the warrant authorizing it. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 394 n. 7, 91 S.Ct. 1999, 2004 n. 7, 29 L.Ed.2d 619 (1971). The Supreme Court has also stated that searches involving documents must be "conducted in a manner that minimizes unwarranted intrusions upon privacy." *Andresen v. Maryland,* 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n. 11, 49 L.Ed.2d 627 (1976). However, when items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search. *Id.; United States v. Dunloy,* 584 F.2d 6, 11 n. 4 (2d Cir.1978). Courts have also indicated that the drastic remedy of the suppression of *all* evidence seized is not justified unless those executing the warrant acted "in flagrant disregard" of the warrant's terms. *United States v. Medlin,*

---

1. The district court held that Caraballo did not have standing to challenge the search of the house and barn. We need not review this conclusion because Matias, Sr. does have standing and, but for one matter, raises the same issues

as Caraballo. The exception is that Caraballo argues that the warrant was an impermissible general and exploratory warrant, a claim with no merit whatsoever in light of the detailed authorization for seizure.

798 F.2d 407, 411 (10th Cir.1986); *United States v. Crozier*, 777 F.2d 1376, 1381 (9th Cir.1985); *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985); *Marvin v. United States*, 732 F.2d 669, 674–75 (8th Cir.1984); *United States v. Wuagneux*, 683 F.2d 1343, 1354 (11th Cir. 1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *United States v. Heldt*, 668 F.2d 1238, 1259 (D.C.Cir.1981) (per curiam), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982).

■ However, we fail to perceive how these principles are implicated on the present record because there was no widespread seizure of items that were not within the scope of the warrant. The government did offer to return an eyeglass case and some other nondocumentary items, but the documents and photographs that are the foundation for the claim of an unconstitutional wholesale search were properly seized under the authority of the warrant.

Paragraph (f) of the warrant authorized seizure of "books and records [that] would reveal the identities of confederates in narcotics trafficking as well as the extent of their involvement." The disputed items clearly fall within this authorization. For example, receipts for materials used to build the barn that housed the cocaine processing laboratory aided in identifying the conspirators and in proving the extent of their individual involvement. Ownership records for the property were similarly relevant to determining the identity of participants in the conspiracy. Finally, given the fact that the agents were aware from their surveillance that the participants in the conspiracy were Hispanic males, many of the photographs seized may reasonably be considered records identifying additional participants in criminal activity. Indeed, Luis Garcia was pictured in some of the photos. Judge Wexler thus correctly denied the suppression motion.

**B.** *Conduct of the Trial*[2]

■ Matias, Sr. and Caraballo argue that the trial judge erred by precluding the introduction of a statement made by Luis Garcia at the time of his guilty plea as a statement against Garcia's penal interest under Fed.R.Evid. 804(b)(3). We disagree. Whether or not the statement meets the various requirements of that exception to the hearsay rule, exclusion of the statement was harmless error. In that statement, Garcia said:

I really, I was in debt of a lot of money, I owed these people and I had a lot of pressure on me and the only way I can get out is to—since I had to get a place for them where they can try to make cocaine and any place so the only thing I can do is I know my friend Miguel owned property and he wanted to sell some of the property and he offered me before the property was sold. I went to Miguel and I told him if I can take the property and I will be able to buy that property from him for $15,000. So I agree with him to pay him $250.00 a month for rent for the place, we can build out the place. I can let the people build the place and Miguel's bounds there. They can do what they are suppose to do in there.

The statement is wholly irrelevant with regard to Caraballo because he is not even mentioned. So far as Matias, Sr. is concerned, the statement is equivocal at best and quite harmful at worst. Garcia's statement that he was renting the land was inconsistent with Matias, Sr.'s testimony as to a sale but consistent with land records. Were the jury to accept the rental version, a conviction would almost surely follow in light of Matias, Sr.'s knowledge of Garcia's previous drug arrest and the natural curiosity any owner would have as to the use of the new barn. In any event, even if the sale version were accepted, Garcia's statement in no way indicates that Matias, Sr. was unaware of the use of the barn.

---

**2.** We reject Caraballo's claim that the evidence against him on the possession count was legally insufficient. Caraballo was charged as an aider and abetter. The evidence that he picked up the ether, disposed of the garbage left after the cocaine processing and suffered from an eye irritation reasonably connected to working in the cocaine laboratory was more than sufficient to prove that role.

■ We also reject Caraballo's claim that he was denied his right to confrontation under the sixth amendment under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), by the admission of post-arrest statements made by Miguel Matias, Jr. because Caraballo's counsel expressly abandoned the objection based on *Bruton*. Judge Wexler offered to redact the statements so as to avoid any reference to Caraballo when his counsel explicitly withdrew the objection to the unredacted statements. Moreover, after the Matias sons had been dismissed from the case, Judge Wexler was prepared to instruct the jury that it should not consider their statements at all. Caraballo's counsel again withdrew any objection to the statements. The statements themselves were consistent with Caraballo's defense that he was an innocent errand boy, and, when faced with a choice between preserving a weak claim of error and using the evidence to his client's advantage, defense counsel opted for the latter.

■ Caraballo's final claim concerns the judge's inclusion of a conscious avoidance charge in the instructions relating to the possession count. With one exception discussed in the next paragraph, Caraballo does not object to the substance of the charge. Instead, he argues that under the circumstances such a charge should not have been given at all because it might confuse the jury, and lead it to apply the principles it enunciated to the conspiracy count. We disagree. Such a charge was certainly appropriate in light of Matias' request for it and of Caraballo's argument that his knowledge of the criminal scheme was a major disputed issue. Finally, the charge was clearly limited to the possession count, and we perceive no reason why the jury would apply this instruction to the conspiracy count.

■ Caraballo also contends that the district judge impermissibly shifted the burden of proof in the conscious avoidance charge by instructing the jury that "you may find that the defendant acted knowingly if you find he knew there were narcotics in the barn or that he deliberately closed his eyes to what he had every reason to believe were the facts, unless you find the defendant believed that the barn did not contain narcotics." We perceive the problem here to be more one of lack of clarity than of shifting the burden of proof. Read literally, this instruction actually allowed the jury to acquit Caraballo even if he knew there were narcotics in the barn or deliberately refused to believe what he had every reason to believe. Whatever harm, if any, was caused by the use of "unless" was certainly cured by Judge Wexler's previous instruction that the jury might convict on a conscious avoidance theory only if it found beyond a reasonable doubt that a defendant was aware of a high probability of the presence of narcotics and consciously avoided confirming that fact to create a defense of lack of knowledge.

■ Matias, Sr. argues that the instruction regarding his credibility was so unbalanced as to amount to reversible error. We agree. Because the jury had heard testimony from Matias, Sr. the district judge included in his instructions to the jury the following:

The law permits a defendant at his own request to testify in his own behalf. The testimony of an individual defendant is before you. You must determine how far it is credible. The deep personal interest which every defendant has in the result of his case should be considered in determining the credibility of his testimony.

You are instructed that interest creates a motive of false testimony, that the greater the interest, the greater is the temptation and that the interest of the defendant is of a character possessed by no other witness and is, therefore, a matter which may seriously affect the credence that should be given to his testimony. But you should consider his testimony.

Although we have upheld convictions despite jury instructions that emphasized the defendant's motive to falsify his or her testimony, we have always expressed our concern that such instructions not single out defendants as being invariably less

credible than other witnesses. *See United States v. Assi,* 748 F.2d 62, 68 (2d Cir.1984). As a result of this concern, we have insisted that the challenged instruction contain some "balancing language." *United States v. Schlesinger,* 598 F.2d 722, 727 (2d Cir.), *cert. denied,* 444 U.S. 880, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979); *United States v. Vega,* 589 F.2d 1147, 1154 & nn. 5–6 (2d Cir.1978); *United States v. Hernandez,* 588 F.2d 346, 349–50 & n. 2 (2d Cir.1978); *United States v. Martin,* 525 F.2d 703, 706 & n. 3 (2d Cir.), *cert. denied,* 423 U.S. 1035, 96 S.Ct. 570, 46 L.Ed.2d 410 (1975). We have thus stated:

> Unquestionably, it is the court's duty, in instructing a jury on the subject of witnesses' credibility, to give balanced instructions. Where the court points out that testimony of certain types of witnesses may be suspect and should therefore be scrutinized and weighed with care, such as that of ... defendants, ... it *must* also direct the jury's attention to the fact that it may well find these witnesses to be truthful, in whole or in part.... In short, the court should not emphasize the suspect nature of the testimony of certain witnesses without pointing out that they may be believed.

*United States v. Gleason,* 616 F.2d 2, 15 (2d Cir.1979) (citations omitted) (emphasis added), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980); *see also United States v. Smith,* 778 F.2d 925, 929 (2d Cir.1985) (any prejudice from prosecutor's remarks on defendant's interest in testifying falsely cured by judge's balancing instruction).

In the past, we have approved as sufficient balancing language a statement that "a defendant's vital interest in the outcome of his trial is not inconsistent with the ability to render truthful testimony." *Vega,* 589 F.2d at 1154 (quoting *United States v. Floyd,* 555 F.2d 45, 47 n. 4 (2d Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977)); *accord Martin,* 525 F.2d at 706 & n. 3. We have also approved language to the effect that a "defendant's testimony is to be judged in the same way as that of any other wit-

ness." *Vega,* 589 F.2d at 1154 n. 6 (emphasis omitted); *accord Schlesinger,* 598 F.2d at 727. The instruction in this case, however, singled out the defendant's motive to falsify without including anything that can fairly be characterized as balancing language. The government points to the portion of the instruction telling the jury that it should "consider" Matias, Sr.'s testimony. However, we believe that sentence, which merely confirms that Matias, Sr.'s testimony is admissible, hardly balances the prior statements singling out his testimony for disbelief. Moreover, the omission of balancing language is not harmless. The issue of Matias, Sr.'s guilt turns in no small part upon his credibility, and he was entitled under our prior decisions to an instruction concerning his credibility that did more than emphasize his motive to lie.

### CONCLUSION

We affirm Caraballo's conviction. We reverse Matias, Sr.'s conviction and remand.