## COMMONWEALTH *vs.* ALEX RANKINS.

Hampshire. February 2, 1999. - April 30, 1999.

Present: WILKINS, C.J., ABRAMS, GREANEY, FRIED, & IRELAND, JJ.

*Evidence,* Admissions and confessions, Wiretap, Conspiracy, State of mind. *Constitutional Law,* Admissions and confessions, Self-incrimination, Assistance of counsel, Waiver of constitutional rights, Search and seizure, Jury. *Search and Seizure,* Electronic surveillance. *Electronic Surveillance. Conspiracy. Practice, Criminal,* Venue, Jury and jurors, Place of trial, Capital case.

In a murder case, the record of a hearing on the defendant's motion to suppress statements warranted the judge's finding beyond a reasonable doubt that the police scrupulously honored the defendant's right to remain silent, that the defendant knowingly initiated further communication with the police, and that statements he made thereafter, after receiving Miranda warnings, were given knowingly and voluntarily. [471-473]

An assistant district attorney is authorized by G. L. c. 272, § 99, to play to a grand jury, without prior judicial approval, a duplicate recording of a communication intercepted by a lawful wiretap. [473-474]

At the trial of a murder indictment, certain out-of-court statements made by the defendant's alleged coconspirator were properly admitted as made during the course of and in furtherance of a common criminal goal, where there was sufficient other admissible evidence to establish an adequate probability that the defendant and the other were engaged in a criminal enterprise. [474-475]

At a murder trial, the judge properly admitted evidence tending to show the relationship between the defendant and his alleged coconspirator [475], and evidence of the defendant's incriminating admissions to others [475].

On the record of a murder trial in which the defendant moved for a change of venue to an unspecified county to escape pretrial publicity, it was not demonstrated that the change of venue from Hampshire to Franklin County violated the defendant's rights under art. 12 of the Massachusetts Declaration of Rights, where there was no substantial dissimilarity in the minority population of the two counties. [475-476]

INDICTMENT found and returned in the Superior Court Department on June 21, 1994.

Pretrial motions to suppress evidence, to dismiss, and for a change of venue were heard by *John F. Murphy, Jr.,* J., and the case was tried before him.

*David P. Hoose* for the defendant.

*Judith Ellen Pietras,* Assistant District Attorney (*David S. Ross,* Assistant District Attorney, with her) for the Commonwealth.

WILKINS, C.J. The defendant appeals from his conviction of murder in the first degree of Robert D'Amour in March, 1993. The victim had been shot several times in his home in South Hadley.

Investigation led the police to suspect the victim's wife, Suzanne D'Amour (D'Amour), and the defendant. They believed that D'Amour and the defendant had murdered the victim in order to obtain substantial amounts of insurance that D'Amour had purchased on the life of the victim. The police obtained evidence from an authorized wiretap of D'Amour's home telephone. They interviewed the defendant in a jail in Louisiana, where he lived, after local authorities had arrested him on a Massachusetts warrant concerning an unrelated charge. All the defendant's challenges on appeal concern the admission of evidence: the wiretap evidence, his statements to the police during interviews in Louisiana, and various other evidence, including statements of his alleged coconspirator, D'Amour. He makes no independent argument that he is entitled to relief under G. L. c. 278, § 33E. We affirm the defendant's conviction.[1]

1. The defendant sought unsuccessfully to suppress statements that he made to two Massachusetts State police sergeants on March 27 and 28, 1993, while he was being held on unrelated Massachusetts charges in a jail in Lake Charles, Louisiana.

We summarize the motion judge's findings of fact, which were fully warranted by the evidence.[2] At the first interview on the night of March 27, Sergeant Gibbons of the State police read the defendant complete Miranda warnings. The defendant

---

[1] D'Amour was tried separately for murder on the theory that she hired the defendant to kill her husband. The jury acquitted her of that charge but convicted her on two counts of perjury before the grand jury and one count of attempting to incite perjury. See *Commonwealth* v. *D'Amour,* 428 Mass. 725, 727 (1999). "Knowing that Rankins [the defendant] was the prime suspect in her husband's murder, [D'Amour] lied about the true nature of her relationship with Rankins to hinder the investigation of the murder of her husband." *Id.* at 745.

[2] We dispose summarily of two of the defendant's related arguments. The Commonwealth was not required to rely solely on the facts set forth in notes of the interrogation that one of the sergeants took. This court has not required that, as a condition of admissibility of a defendant's statements, interviews be

said that he was already aware of his rights, that he understood them, and that he would talk to the police. The defendant was not handcuffed or shackled, no jail guard was present, and the interview room door was open.

Early in the interview the defendant said that he had been in Springfield, Massachusetts, from late February until late March, 1993. When asked if he had gone to South Hadley during this time, the defendant became upset with the question, jumped out of his chair, and stated he wanted a lawyer present. Sergeant Samuelson told him to stop talking and that they would not speak with him until an attorney was present. The defendant then said he would "have to think hard about this" and asked them to give him some time. He left the room and paced the corridor. The defendant returned to the interview room within three minutes and stated he was willing to continue talking. He made this statement before the police officers made any comment. Sergeant Gibbons read the defendant the Miranda warnings a second time. They asked him if he was sure he wanted to talk further, and the defendant said he was.

When the interview continued, the defendant acknowledged that he knew Robert D'Amour and his wife and that he had acted as a bodyguard for the victim in late February in West Springfield. When asked about the date of a telephone call he had received from Robert D'Amour, the defendant suggested they "talk to Bob." The officer then told him that Robert D'Amour had been murdered. The defendant again became agitated, jumped from his chair, and accused the two police officers of trying to "fuck him up." He asked how the killing occurred. The defendant said that he would "go back to Massachusetts and straighten things out," but that he needed more time to think, that his mind was "blown," and he would let them know the next day if he would answer any more questions. Questioning stopped.

The two officers returned to the jail the next day, about 7 P.M. At that time the defendant was calm. He told officers that he was willing to talk to them, and Sergeant Gibbons read him the Miranda warnings for the third time. The defendant told of being in the D'Amour home in South Hadley on March 1 and that D'Amour had told him that, in December, 1992, someone had shot him in Springfield.

recorded or videotaped. See *Commonwealth* v. *Ardon*, 428 Mass. 496, 498 (1998).

During the course of the first interview, the defendant unequivocally asserted his right to counsel and his right to remain silent. If a person has stated a desire to deal with the police only with the aid of counsel, the police may not question that individual unless he initiates further communication. *Edwards* v. *Arizona*, 451 U.S. 477, 484-485 (1981). See *Commonwealth* v. *Judge*, 420 Mass. 433, 448 (1995). The Commonwealth has the burden of proving beyond a reasonable doubt that subsequent events indicated a voluntary, knowing, and intelligent waiver of the right to have counsel present and of the right to remain silent. *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1044 (1983). *Commonwealth* v. *Sarourt Nom*, 426 Mass. 152, 156-157 (1997).

The facts warrant the judge's finding beyond a reasonable doubt that the police scrupulously honored the defendant's right to remain silent and that the defendant knowingly initiated further communication when he returned to the interrogation room. At that point, the defendant received Miranda warnings again and said that he understood his rights. He then answered some questions but not others, indicating thereby that he understood his right to remain silent. See *Commonwealth* v. *Westmoreland*, 388 Mass. 269, 278 (1983). The defendant ended the interview. On the next evening, the defendant spoke with the troopers but, significantly, only after he had again received Miranda warnings. See *Commonwealth* v. *Doe*, 37 Mass. App. Ct. 30, 35 (1994).

2. The defendant challenges the denial of his motion to suppress wiretap evidence. All but one of his arguments was disposed of in *Commonwealth* v. *D'Amour*, 428 Mass. 725, 732-741 (1999), in which we upheld the denial of D'Amour's challenge to the admissibility of evidence from the same wiretap. His remaining argument is that the contents of wire interceptions were improperly presented to the grand jury by use of a copy of the tape of the wiretap recordings.

General Laws c. 272, § 99 N, provides that duplicate recordings of intercepted communications may be made for use pursuant to § 99 D 2 a and b. Section 99 D 2 a and b permit an investigative or law enforcement officer who lawfully knows of the contents of a wire communication, to use or disclose the contents "in the proper performance of his official duties." An attorney authorized by law to participate in the prosecution of offenses designated in G. L. c. 272, § 99, is defined as an

"investigative or law enforcement officer." G. L. c. 272, § 99 B 8. Therefore, an assistant district attorney, without prior judicial approval, may properly play to a grand jury a duplicate recording of an intercepted communication. The defendant makes no claim that the use of duplicate recordings before the grand jury violated a Federal statutory provision that, under *Commonwealth* v. *Vitello*, 367 Mass. 224, 247 (1975), must be implicit in our wiretap statute.

3. The defendant objects to the admission of certain out-of-court statements made by his alleged coconspirator, D'Amour. D'Amour's extrajudicial statements were admissible if made during the course of and in furtherance of a common criminal goal and if there is other sufficient admissible evidence to establish an adequate probability that D'Amour and the defendant were engaged in a criminal enterprise. *Commonwealth* v. *Nascimento*, 421 Mass. 677, 680-681 (1996), and cases cited. The date on which a conspiracy allegedly began is not an absolute bar to looking at earlier events that have a bearing on the existence of the conspiracy. *Commonwealth* v. *Borans*, 379 Mass. 117, 146-147 (1979), and cases cited. See *Commonwealth* v. *Pero*, 402 Mass. 476, 481 (1988) (evidence that relates to entire history of conspiracy admissible "though the specific evidence predates the conspiracy").

The judge did not err or abuse his discretion in admitting a letter that D'Amour wrote to the defendant in March, 1991, approximately two years before the murder, in which she expressed her love for the defendant and her disdain for her husband. There was ample evidence of the existence of a conspiracy, and an inference was warranted that the conspiracy began in December, 1990, when D'Amour purchased a $1,300,000 insurance policy in her favor on the victim's life.[3] Even if the conspiracy had not commenced when it was written, the letter disclosed a relationship that was relevant to whether there was a later conspiracy. Moreover, D'Amour's state of mind was relevant to show her relationship with the defendant. See *Commonwealth* v. *Fernandes*, 427 Mass. 90, 95 (1998); *Commonwealth* v. *Wampler*, 369 Mass. 121, 123 (1975). The question of remoteness of the date of the letter in relation to the date of the murder was for the judge to decide in his discretion. *Commonwealth* v. *Brooks*, 422 Mass. 574, 581 (1996).

---

[3]At that time the victim had lost his license to practice dentistry and was unemployed. See *D'Amour* v. *Board of Registration in Dentistry*, 409 Mass. 572 (1991).

D'Amour's statements to the police and her grand jury testimony that sought to minimize her relationship with the defendant were admissible, in face of contrary evidence, as tending to prove that she was lying about the extent to their relationship. There is no hearsay concern because the statements were not offered to prove their truth. See *Commonwealth* v. *Koney*, 421 Mass. 295, 303 (1995). The inference was warranted that the statements were made in an attempt to conceal the conspiracy at a time when no one had been charged with the murder.

4. The judge properly admitted evidence that, shortly after the murder and when D'Amour knew that the defendant was a suspect, D'Amour contributed toward the defendant's bail on the unrelated charge and later contributed $50,000 toward the defendant's legal fees. This evidence tended to show the relationship of the parties. The judge gave strong limiting instructions concerning the jury's consideration of this evidence and of evidence of the defendant's incarceration on another matter. It was for the jury to decide whether D'Amour's financial assistance was probative of a conspiracy and its furtherance and whether it contradicted D'Amour's statements about the nature of her relationship with the defendant. It was hard to distinguish these challenged payments from evidence, not objected to, of other payments, totaling $20,000, that D'Amour made to the defendant.

The defendant's incriminating statements to witnesses were admissions not subject to exclusion as hearsay. See *Commonwealth* v. *DiMonte*, 427 Mass. 233, 243 (1998). One witness testified that the defendant had told him that he had "popped" a white person from Hadley. Another testified that the defendant had told her than an indictment had issued against him and for that reason he was leaving for Brazil, that D'Amour had better keep her mouth shut, and that he would kill the witness if she said anything. A third witness testified that the defendant had told him in jail that "if it was done right the first time, I wouldn't be here," and that the defendant had mentioned something about an insurance policy. The credibility of these witnesses was for the jury, an issue the defendant fully pressed on cross-examination and otherwise.

5. The defendant moved for a change of venue to escape pretrial publicity in Hampshire (and Hampden) Counties without specifying a specific alternate county. The judge transferred the

case to Franklin County from Hampshire County. Seven days before trial was to begin and ten days after the judge had ordered the transfer, the defendant, who is African-American, moved for reconsideration, arguing that the minority population of Franklin County was smaller than that of Hampshire County and that his rights under art. 12 of the Massachusetts Declaration of Rights were violated.[4] This court expressed concern in *Smith* v. *Commonwealth*, 420 Mass. 291 (1995), about a systematic transfer of cases for jury trials from Suffolk County to Middlesex County because the minority population in Suffolk County was four times that of Middlesex County.

The trial judge concluded that there was no substantial dissimilarity in the minority population of the two counties. The record shows that in 1990 Hampshire County had a minority population of 7.5% and Franklin County had a minority population of 2.6%. The African-American population of each respective county was 1.7% and 0.7%.

There was no systematic exclusion of minorities. On this record, we see no showing of a denial of the defendant's art. 12 right to a jury selection process free of discrimination against his grouping in the community. See *Smith* v. *Commonwealth*, *supra* at 295, and cases cited.

When a defendant waives his right to be tried by a jury selected from the vicinity of the crime by seeking a change of venue (see *Commonwealth* v. *Aldoupolis*, 390 Mass. 438, 441 [1983]), he must consider the possible consequences of his action and may seek to limit the counties to which his case would be transferred. Certainly, a motion judge may consider race, but the defendant had no State constitutional right to a transfer only to a county that had at least as great a minority population as Hampshire County.

---

[4]The defendant does not rely on any provision of the Constitution of the United States. Attempts elsewhere on Federal constitutional grounds to challenge a transfer of a case for trial based on arguments similar to that made to us under art. 12 have been notably unsuccessful. See, e.g., *Epps* v. *State*, 901 F.2d 1481, 1483 (8th Cir. 1990) (court troubled because State trial of black defendant was moved "to a county with such a small black population that there was virtually no chance that any black persons would be included on the venire." Nevertheless, the court said, "we are unaware of any authority to support a conclusion that [the defendant's] constitutional rights were thereby violated"); *People* v. *Remiro*, 89 Cal. App. 3d 809, 838-839, cert. denied, 444 U.S. 876 (1979); *James* v. *State*, 613 N.E.2d 15, 29 (Ind. 1993); *Mallett* v. *State*, 769 S.W.2d 77, 81 (Mo. 1989), cert. denied, 494 U.S. 1009 (1990).

6. There is no basis for the granting of relief pursuant to G. L. c. 278, § 33E.

*Judgment affirmed.*