**Alex M. RANKINS, Petitioner,**

v.

**Paul MURPHY, Respondent.**

**No. CIV.A. 00–30056–MAP.**

United States District Court,
D. Massachusetts.

March 28, 2002.

David P. Hoose, Katz, Sasson & Hoose, Springfield, MA, for Petitioner.

Cathryn A. Neaves, Attorney General's Office, Linda Wagner, Assistant Attorney General, Criminal Bureau, Boston, MA, for Respondent.

## MEMORANDUM REGARDING PETITIONER'S REQUESTS FOR A WRIT OF HABEAS CORPUS

(Docket Nos. 1 & 20)

PONSOR, District Judge.

## I. INTRODUCTION

*Habeas corpus* petitioner, Alex Rankins ("petitioner") contends that he has been

wrongly imprisoned following a murder conviction in Franklin County Superior Court on October 25, 1996. Petitioner claims that his conviction was obtained in violation of Title III, 18 U.S.C. § 2518 (the "Wiretap Act") and the Confrontation Clause of the Sixth Amendment. For the reasons discussed below, petitioner's motion will be denied.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*[1]

Robert D'Amour ("Mr.D'Amour") was found dead of gunshot wounds in his home in South Hadley on March 6, 1993. *Commonwealth v. D'Amour*, 428 Mass. 725, 727, 704 N.E.2d 1166 (1999). Police came to the scene, conducted a search of the home, and seized several items. Among the seized items was a letter found in the master bedroom that began, "My Dearest Alex ...." The letter was from Mr. D'Amour's wife, Suzanne D'Amour ("D'Amour"), to petitioner, expressing D'Amour's love for petitioner, and her disdain for Mr. D'Amour. 428 Mass. at 728, 704 N.E.2d 1166.

Police next found that Mr. D'Amour had life insurance policies worth almost three million dollars, and that D'Amour was the beneficiary. This finding and the "Dear Alex" letter, along with other evidence, made D'Amour and petitioner suspects. The Government eventually developed the theory that petitioner and D'Amour murdered Mr. D'Amour to further their love affair and to secure the insurance proceeds. *Commonwealth v. D'Amour*, 428 Mass. 725, 727, 704 N.E.2d 1166 (1999).

The Government subsequently applied for, and secured, an authorization to tap several of D'Amour's phones. The assistant district attorney, David Ross, ("Ross") signed the wiretap warrant application, beginning with the statement, "I, David S. Ross, Assistant District Attorney for the Northwest District ... being duly sworn, depose and say ..." However, there is no dispute that Ross was never formally placed under oath.

The judge approved the warrant and ordered:

> Upon conclusion of the monitoring and recording on each day on which this warrant is being executed, the original tapes of the matters recorded are to be sealed by the law enforcement officials executing this warrant. Said sealing shall take place upon completion of a working copy of the tapes. The sealing shall include physical sealing of the tapes, together with the sealing officer's initials and the date upon which the tapes were sealed. Said sealed tapes are to then remain in the custody of law enforcement officials designated to execute this warrant until such time as it is appropriate that they be delivered to me for delivery to the Chief Justice's office.

428 Mass. at 741 n. 18, 704 N.E.2d 1166. These orders were carried out, and the tapes were sealed at the end of each day. *Id.* at 741, 704 N.E.2d 1166. There is no indication in the record, and petitioner does not claim, that the Government tampered with the tapes in any way.

After the final wiretap order expired, the sealed box was delivered to the judge, and the delivering officer offered to open it

---

1. The following summary of the facts and proceedings relies on *Commonwealth v. Rankins*, 429 Mass. 470, 709 N.E.2d 405 (1999) and *Commonwealth v. D'Amour*, 428 Mass. 725, 704 N.E.2d 1166 (1999), the two cases decided by the Supreme Judicial Court of Massachusetts relevant to the petition. The Supreme Judicial Court's findings of fact are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); *DiBenedetto v. Hall*, 272 F.3d 1, 7 n. 1 (1st Cir.2001).

for inspection. The judge declined, but signed a sealed envelope and attached it to the box. The box was brought back to the Crime Prevention and Control Unit, where it spent the night in the evidence locker before being transferred the next day to the office of the Chief Justice of the Superior Court in Boston. *Id.* at 739–740, 704 N.E.2d 1166.

At trial, petitioner faced, along with other evidence: (1) the wiretap recordings, (2) the "Dear Alex" letter, and (3) several out-of-court statements by D'Amour admitted pursuant to the Massachusetts version of the co-conspirator exception to the hearsay rule. The admission of this evidence forms the basis of petitioner's collateral challenge to his imprisonment.

Petitioner was convicted of first degree murder on October 25, 1996. (Docket 18 at 1). He appealed, and his conviction was eventually affirmed by the Supreme Judicial Court on April 30, 1999 in *Commonwealth v. Rankins,* 429 Mass. 470, 709 N.E.2d 405 (1999). D'Amour was tried separately. The jury acquitted her of the murder charge, but convicted her on two counts of perjury and one count of attempting to incite perjury. *Id.* D'Amour's convictions were affirmed on January 27, 1999, in *Commonwealth v. D'Amour,* 428 Mass. 725, 704 N.E.2d 1166 (1999), which also disposed of several issues related to petitioner's appeal.

### III. *Standard of Review*

Petitioner's application is governed by the standards set forth by the Antiterrorism and Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. Section 2254 provides that a state court prisoner may petition a federal court if he "is in custody in violation of the Constitution or laws ... of the United States." *Id.* Thus, both petitioner's statutory and constitutional claims are cognizable.

Nevertheless, the court's review of petitioner's claims under the Wiretap Act will be limited. The Supreme Judicial Court considered and rejected petitioner's Wiretap Act claims. 428 Mass. at 738 n. 15, 741, 704 N.E.2d 1166. Therefore, petitioner must satisfy the provisions of 28 U.S.C. § 2254(d), which require petitioner to show that the SJC's adjudication,

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See also Williams v. Taylor,* 529 U.S. 362, 405–412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Mountjoy v. Warden,* 245 F.3d 31, 35 (1st Cir.2001).

In addition, petitioner's Wiretap Act claims are non-constitutional. A federal court may only allow a state court prisoner's *habeas* petition alleging "violations of federal laws when the error qualifies as 'a fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure.'" *Reed v. Farley,* 512 U.S. 339, 348, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994)(plurality opinion of Ginsburg, J.), *quoting Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). Although *Reed* and *Hill* were decided prior to the AEDPA, their holdings survived AEDPA's enactment. *See, e.g., United States v. Cepero,* 224 F.3d 256, 267 (3d.Cir.2000), *cert. denied* 531 U.S. 1114, 121 S.Ct. 861, 148 L.Ed.2d 774 (2001)(noting that *habeas* petitions only protect a defendant "from a statutory defect so fundamental that a complete miscarriage of justice has oc-

curred"), *citing Reed*, 512 U.S. at 348, 114 S.Ct. 2291.

Petitioner's Confrontation Clause claims will face a more favorable standard of review. They will be analyzed *de novo* in accordance with the First Circuit's decision in *Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir.2001), because they were not "adjudicated on the merits in state court." 28 U.S.C. § 2254(d).[2] However, "any factual determinations that [the state court] makes—even if they relate solely to an independent state claim—remain entitled to the presumption set forth in 28 U.S.C. § 2254(e)(1) insofar as they may be useful in consideration of the federal claim." *DiBenedetto v. Hall*, 272 F.3d 1, 7 n. 1 (1st Cir.2001).

## IV. *Discussion*

### A. *Wiretap Act*

#### 1. *Sworn Affidavit*

■ Petitioner argues first that he is unlawfully imprisoned because Assistant District Attorney Ross was not formally sworn before making his wiretap warrant application. Title 18, Section 2518(1), provides that,

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application.

*Id.* Ross was not under oath or affirmation. Indeed, to his credit, Ross admitted to the court at the hearing on the motion to suppress that he had copied the phrase, "duly sworn, deposed and say" from an M.C.L.E. book, but never had been placed under oath formally. (Docket 26 at 676–681). Therefore, approval of the warrant application facially contravened Title III.

Nevertheless, the Supreme Judicial Court rejected petitioner's argument that Title III was violated. According to the Supreme Judicial Court, Mass. Gen. Laws ch. 272, § 99 F. 1 did "not require a jurat or formal swearing or oath before the court." 428 Mass. at 738, 704 N.E.2d 1166. Simply "by stating that he was 'sworn,' the assistant district attorney placed both his professional reputation and license behind the application." *Id.* The Supreme Judicial Court found further that "the same analysis applie[d]" to petitioner's Title III claim. *Id.* at n. 15. "Because of the import of the assistant district attorney's statement that he was 'sworn,' the application sufficiently complied with [Title III]." *Id.*

Petitioner understandably disputes this interpretation of Title III. Title III requires that the application "be made in writing upon oath or affirmation to a judge of competent jurisdiction," without qualification. 18 U.S.C. § 2518(1). No authority suggests that Title III is satisfied by anything short of a formal oath. If Title III only required a written and signed statement that facially indicated that the applicant was "duly sworn," few applicants would go through the inconvenient process of actually being put under oath. The wiretap application flatly violated the requirements of Title III.

Nevertheless, this statutory violation is insufficient to support a writ of *habeas corpus*. The court need not address the "reasonableness" of the Supreme Judicial Court's finding. The violation neither resulted in "a complete miscarriage of jus-

**2.** Respondent does not contest petitioner's assertion that his Confrontation Clause argu-

ments were properly presented to the SJC.

tice" nor was "inconsistent with the rudimentary demands of fair procedure." *Reed*, 512 U.S. at 348, 114 S.Ct. 2291.

Indeed, it is not clear that the statutory violation would have warranted suppression even on direct review. In *United States v. Richardson*, 943 F.2d 547 (5th Cir.1991), the Fifth Circuit found that although the Magistrate Judge's failure to formally administer the oath on a home search warrant application violated Fed.R.Civ.P. 41 and the Fourth Amendment, the "good faith" exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), prevented suppression. *Id.* at 550–551. According to the Fifth Circuit, when the failure to formally administer the oath was inadvertent, and there was no showing of dishonesty or recklessness on the part of the applicant, suppression would not serve a deterrent purpose. *Id.* at 551. It found that Magistrate Judges were bound accidentally to fail to administer the oath on "rare occasion[s]," and warrant applicants were unlikely to attempt to circumvent the oath or affirmation requirement because they "will expect to be sworn when preparing their warrant applications" and could not "realistically hope to escape the oath or affirmation requirement." *Id. See also United States v. Matias*, 836 F.2d 744, 747 (2d. Cir.1988) (holding, on direct appeal, that suppression of telephonic warrant was not required under "good faith" exception when Magistrate Judge's "failure to put the agent formally under oath was obviously an oversight").

Further, suppression under Title III "is required only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary device.'" *United States v. Donovan*, 429 U.S. 413, 433–434, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), *quoting United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Petitioner has not shown that the requirement of a formal oath or affirmation was intended "to play 'a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance.'" *Donovan*, 429 U.S. at 437, 97 S.Ct. 658, *quoting United States v. Chavez*, 416 U.S. 562, 578, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974).

The fact that suppression would have been doubtful even on direct review makes it very unlikely that use of the wiretap evidence resulted in "a complete miscarriage of justice" or was "inconsistent with the rudimentary demands of fair procedure." *Reed*, 512 U.S. at 348, 114 S.Ct. 2291. In addition, there is no evidence here that the assistant district attorney was attempting to evade the oath requirement or that his application was mendacious in any way. At the suppression hearing, he testified that when he made the application, he "believed that the application was sworn by virtue of the language that [he] had used ...." (Docket 26 at 678). Therefore, while the warrant application technically violated the Wiretap Act because the applicant was not under formal oath or affirmation, no writ will issue on this basis.

### 2. *Sealing Requirement*

■ Petitioner next contends that he is unlawfully imprisoned because the trial court failed to comply with the Wiretap Act's sealing requirements. Title 18, Section 2518(8)(a) provides,

Immediately upon expiration of the period of the [wiretap] order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custo-

dy of the recordings shall be wherever the judge orders. ... The presence of the seal provided for by this subsection shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication . . . .

*Id.*

Again, the trial judge failed technically to comply with these requirements. As a matter of grammatical structure, the modifier, "[i]mmediately upon expiration of the period of the [wiretap] order, or extensions thereof," governs *both* the requirement that the recordings shall be "made available to the judge," *and* the requirement that the recordings shall be "sealed under his directions." 18 U.S.C. § 2518(8)(a). Thus, Title III requires that the recordings be sealed "[i]mmediately upon expiration of the [wiretap] order, or extensions thereof." *Id.* Sealing the recordings *before* the order expired, even "under [the judge's] directions," technically violated Section 2518(8)(a).

In *United States v. Ojeda Rios,* 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990), the Supreme Court emphasized the importance of Title III's sealing requirement. It noted that "the seal required by § 2518(a) is not just any seal but a seal that has been obtained *immediately* upon expiration of the underlying order." *Id.* at 263, 110 S.Ct. 1845 (emphasis in original). The Court explained that the congressional purpose behind the sealing requirement was "to ensure the reliability and integrity of evidence obtained by means of electronic surveillance. ... [T]he seal is a means of ensuring that subsequent to its placement on a tape, the Government has no opportunity to tamper with, alter, or edit the conversations that have been recorded." *Id.*

Thus, a violation of the sealing requirement is no light matter. Nevertheless, the violation in petitioner's case cannot justify issuance of a writ of *habeas corpus.* Again, it is not necessary to address the reasonableness of the Supreme Judicial Court's ruling under AEDPA. The violation was not " 'a fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure.' " *Reed,* 512 U.S. at 348, 114 S.Ct. 2291.

Here, the tapes were (1) sealed under the directions of the judge issuing the wiretap order; (2) sealed at the end of each day of recording; and (3) made available to the judge issuing the wiretap order immediately upon the expiration of the period of the order, or extensions thereof. There is no charge that the seals were ever broken, or that the Government ever tampered with the recordings.

The procedure used, while a technical violation of Title III, satisfied "the rudimentary demands of fair procedure," and did not result in a "complete miscarriage of justice" within the meaning of *Reed* and *Hill.* "Congress viewed the sealing requirement as important precisely because it limits the Government's opportunity to alter the recordings." *Ojeda Rios,* 495 U.S. at 263, 110 S.Ct. 1845. In this case, the Government's opportunity to alter the recordings was impeded by the daily seal. Indeed, the sealing occurred *earlier* than Title III required. *See Ojeda Rios,* 495 U.S. at 269 n. 1, 110 S.Ct. 1845 (Stevens, J., dissenting)("the underlying concern for the integrity of tapes and accurate recordkeeping supports sealing as early as possible."). No writ will issue on this basis.

B. *Confrontation Clause Claims*

Petitioner next contends that admitting (1) the "Dear Alex" letter; (2) D'Amour statements made to the police after the murder; and (3) D'Amour statements made during her grand jury testimony vio-

lated his rights under the Confrontation Clause and resulted in his imprisonment in violation of the Sixth Amendment to the United States Constitution. As noted, petitioner's Sixth Amendment claims will be reviewed *de novo* because they were not "adjudicated on the merits in state court." 28 U.S.C. § 2254(d).

### 1. *"Dear Alex" letter*

■ Even viewed under *de novo* review, admitting the "Dear Alex" letter did not violate the Confrontation Clause. First, the court presumes as a factual matter, in accordance with 28 U.S.C. § 2254(e)(1), that the conspiracy was in effect when the letter was written. The Supreme Judicial Court found that "[t]here was ample evidence of the existence of the conspiracy, and an inference was warranted that the conspiracy began in December, 1990, when D'Amour purchased a $1,300,000 insurance policy in her favor on the victim's life." 429 Mass. at 474, 709 N.E.2d 405. Petitioner has not rebutted this presumption by "clear and convincing evidence," as § 2254(e)(1) requires. Thus, the conspiracy was presumptively in effect in 1990 for purposes of *habeas* review.

Given this presumption, petitioner's Confrontation Clause challenge fails. Fed. R.Evid. 801(d)(2)(E) provides that a "statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. This exception to the hearsay rule is "firmly rooted," and therefore statements admitted in accordance with it raise no Confrontation Clause concerns. *See White v. Illinois,* 502 U.S. 346, 355 n. 8, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *United States v. Saccoccia,* 58 F.3d 754, 779 (1st Cir.1995).

In addition to being written during the course of the conspiracy, the letter was correctly found to have been written in furtherance of the conspiracy. The Government's theory was that Rankins and D'Amour were lovers, and murdered Mr. D'Amour in order to further their love affair and get away with the insurance money. Thus, D'Amour's love letter to petitioner only months after purchasing the insurance policy could have been properly admitted under Fed.R.Evid. 801(d)(2)(E) as evidence of D'Amour's encouragement and support of the relationship. At a minimum, it could have been admitted "as background for the conspiracy." *United States v. Inadi,* 475 U.S. 387, 398 n. 11, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986). As the Supreme Court has explained, statements by co-conspirators, "not introduced to prove the truth of the matters asserted, but as background for the conspiracy .... 'raise[ ] no Confrontation Clause concerns.'" *Id., quoting Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985). The admission of the "Dear Alex" letter did not offend the Confrontation Clause.

### 2. *Other D'Amour Out–of–Court Statements*

■ Petitioner also argues that the Confrontation Clause was violated when the state court admitted (1) D'Amour statements made to the police after the murder; and (2) D'Amour statements made during her Grand Jury testimony. These statements were admitted as evidence of an attempt to conceal the conspiracy, which qualifies as an exception to the hearsay rule under Massachusetts law. 429 Mass. at 475, 709 N.E.2d 405; *Commonwealth v. Clarke,* 418 Mass. 207, 218–219, 635 N.E.2d 1197 (1994).

Petitioner contends that this rule violates the Confrontation Clause, and correctly points out that evidence of concealment by co-conspirators, after the goal of the conspiracy has been attained, does not qualify under the federal hearsay excep-

tion codified in Fed.R.Evid. 801(d)(2)(E). According to petitioner, "the statements were inadmissible under the federal rule and were therefore admitted in violation of Petitioner's confrontation rights." (Docket 18 at 60).

However, the Supreme Court rejected this argument in *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). There, the Court reviewed a Georgia evidentiary rule that "permit[ted] the introduction of evidence of ... an out-of-court statement even though made during the concealment phase of the conspiracy." *Id.* at 81, 91 S.Ct. 210. The Supreme Court held that "it does not follow that because the federal courts have declined to extend the hearsay exception to include out-of-court statements made during the concealment phase of a conspiracy, such an extension automatically violates the Confrontation Clause." *Id.* The Court explained that the limited scope of the hearsay exception in federal conspiracy trials was a matter of policy, *id.* at 82, 91 S.Ct. 210, and found that the Georgia rule did not violate the Confrontation Clause. *Id.* at 87–88, 91 S.Ct. 210. Like the statements in *Dutton*, D'Amour's statements were reliable for the purpose for which they were introduced. Thus, even under *de novo* review, the court finds that the Confrontation Clause was not offended.

## V. CONCLUSION

For the reasons set forth above, petitioner's motion for a writ of *habeas corpus* is hereby DENIED.

A separate order will issue.