Sanders, Janet L., J.
Defendants Deryck Long and Paul Brown are charged with first degree murder in the shooting death of Jamal Vaughn on January 9, 2006. On January 10, 2006, defendant Deryck Long was arrested on the murder charge and held without bail in the Norfolk County Correctional Center. On January 20, 2006, state police obtained a warrant, pursuant to G.L.c. 272, §99, to intercept any oral communications by Long over the telephone in a specific visitor’s booth at the jail. That warrant was renewed on February 10, 2006! Both defendants now move to suppress the conversations intercepted pursuant to those warrants on the grounds that the affidavit submitted in support of the wiretap application fails to meet the requirements of the statute. In addition, they allege that the affidavit misled the issuing judge by taking certain statements of Long and others out of context. For the following reasons, this Court agrees with the defendants, and concludes that their motions must be Allowed.
BACKGROUND
The Court begins by summarizing those facts set forth in the affidavit of State Police trooper John Moran (the “Moran Affidavit”), submitted in support of the application for a wiretap. Following that summary, this Court will set forth the findings that it makes in light of the testimony offered at the Franks hearing, held on January 16, 2008.
A. The Moran Affidavit
Near midnight on January 9, 2006, Quincy police responded to reports of gunshots fired at 145 Willard Street in Quincy. When they arrived, they found an individual subsequently identified as Jamal Vaughn lying in a rear parking lot: he was suffering from multiple gunshot wounds which ultimately proved to be fatal. Police determined that, immediately before he was shot, Vaughn had been in apartment B-l 1 along with three other people, identified as Taneisha James Pagan, Cory Gibbons, and Lyndia Lewis. Vaughn left the apartment and the three remaining behind heard six to eight gunshots outside. Nine discharged cartridge casings were found on the ground; a fresh palm print was discovered on the hood of a black Toyota parked in the immediate area.
Through interviews over the next few hours, police learned that Vaughn had been in a fight with defendant Long at 236 Franklin Street in Quincy earlier in the evening that he was killed. The fight spilled outside and Long was heard yelling for help to another individual, whom he called “C.” Long left, and Vaughn and others went to 145 Willard Street. Taneisha James Pagan told police that she felt sure it was Long who was the shooter: even though she had not actually *6 witnessed the shooting, she said that Long was known to carry guns.
A check of Long’s criminal record showed an outstanding arrest warrant for intimidation of a witness and assault and battery, as well as possession of a class D substance. In the afternoon of January 10, 2006, Long was arrested on the outstanding warrants. After being informed of his Miranda rights, he admitted that he had been in a fight with Vaughn at 236 Franklin Street but said he had gone to Boston with a friend after that. He denied being at 145 Willard Street. Immediately after his arrest, however, police interviewed Lyndia Lewis (one of the three occupants of the apartment at 145 Willard Street) and she told police she had seen Long running from the area immediately after Vaughn was shot. With this information, police charged Long with murder.
Further investigation determined that Long was not the only shooter. The palm print on the Toyota did not match that of Long. A ballistics examination determined that the projectiles recovered from Vaughn’s body were from two different types of guns. A surveillance video at a Home Depot store adjacent to the shooting showed separate muzzle flashes in two different locations. Anxious to learn the identity of the other shooter, trooper Moran on January 12, 2006 decided to review recordings of telephone conversations that Long had from the jail in hopes of developing a lead. The conversations set forth in Moran’s affidavit were between Long and his girlfriend, Tayna Newsome, with a third person (Coutney Forde) linked in by Newsome on one occasion.[1] Excerpts from those conversations are set forth in paragraphs 17 and 18 of the Moran Affidavit, and are as follows.
In one recording, Long told Newsome that “I need to politic with you outside this airway” and urged her to visit. In a later recording, he asked her to contact two other friends to come see him, stating that “if I get indicted it’s a wrap . . . you know what I’m saying . . . but you know if (inaudible) one of you all at least can come see me ... I mean . . . I’ll be able to save that indictment.” The affidavit also stated that it was clear from these recordings that Newsome and Long knew the identity of the person who had seen Long running from the scene of the shooting.
In the meantime, police were developing additional information with regard to the identity of the second shooter. Specifically, they learned that “C” was likely Courtney Forde, whose nickname was “Casino.” Forde had a criminal record which included possession of a firearm. Another witness who lived at the 145 Willard Street apartment complex where the shooting occurred told police that “Casino” called her right before the shooting, which was unusual since she had not heard from him in some time. After the call, she heard shots outside and saw a car exit the parking lot at a high rate of speed. This witness immediately called Casino back and asked him if he had anything to do with the shooting. He did not respond. Using the telephone number that this witness had for Casino, police searched cell phone records and confirmed that a phone in the name of Courtney Forde was the source of several calls right around the time of the shooting and that these calls had been made from a location only a half mile from 145 Willard Street.
With this additional information, Moran went back to the jail to listen to more conversations of Long on January 17, 2007. In one telephone call, Newsome brought into the conversation a third party, who identified himself as “C.” C told Long that he was “laying low,” but was having others submit requests so that he could visit Long in jail. Long instructed “C” to “fall back . . . way back.” Based on the police investigation so far, Moran felt confident that “C” was Forde, and that Forde had been with Long when Vaughn was shot.
The Moran Affidavit then drew certain conclusions from these recorded telephone conversations: in Moran’s view, they showed that Long was anxious to speak with his “associates” about the shooting without being recorded so that he could provide instructions to “prevent his indictment.” As to what those instructions could be, Moran stated that “it is my belief that Deiyck Long will communicate with Tayna Newsome, Richard Long, and Courtney Forde . . . about a plot to prevent a key eye witness from testifying against him, which may include instructions to murder the witness.” Moran also stated that he expected that such communications would also include information about the identify of the second shooter.
Moran learned that all inmates at the Norfolk County jail converse with visitors over a telephone set up in a booth with a glass divider. He asked for permission to wiretap the telephone for booth #8, which would be designated for Deryck Long exclusively. On January 20, 2006, a judge of this Court (Fabricant, J.), approved the application for a wiretap. Although police had compact discs which contained all of the conversations which Moran had listened to, these CDs were not made available to the judge. This was contrary to the statute, which requires that “a copy or detailed description thereof should be annexed to or included in the application.” G.L.c. 272, §99 E(3).
B. The Franks Hearing
When this matter first came before this Court in November 2007, defense counsel made available for me transcripts of some of these conversations in their entirely. A review of those transcripts showed that the statements made by Long and Newsome that were described in the Moran Affidavit were taken out of context and presented in a way which was misleading. My findings in that regard are set forth in this Court’s Memorandum of Decision and Order on the Defendant’s Motion for a Franks Hearing, dated November 7, 2007. Since that decision, this Court held a Franks hearing, and the CDs of all the conversations that Moran listened to were admitted into evidence. A review of *7 this additional material only strengthens this Court’s conclusion that, had all the material been presented to the issuing judge, she would not have been able to find the probable cause necessary for this kind of warrant. Given the extent to which they detract from Moran’s statement that there was in all likelihood an organized plot afoot to obstruct justice and even to kill a witness, this Court finds that these omissions by Moran had to have been intentional, or at least made with a reckless disregard for the fact that they presented a false impression of events to the Court.
In particular, the Court notes the following additional omissions:
One of the “associates” that the affidavit implies may be part of the plot to kill a witness was Richard Long. Moran listened to a 30-minute conversation between Deiyck Long and Richard Long and heard nothing to support that conclusion. Instead, most of the conversation concerned the fact that Deiyck Long had no money in his canteen fund at the jail (“Imma broke and Imma chokin . . .”) and wanted Richard Long to come visit him in order to get him some money. There was no mention of the case against Long except to how long he was at Newsome’s house on the . night of the shooting. Nothing was said about any eyewitnesses. Not only did Moran not include the details of this conversation in his affidavit but he failed even to mention that he had listened to a conversation between the two Longs.
Moran also listened to a conversation between Deiyck Long and Gillian Gibbs — another conversation he failed to report in the affidavit. Again, neither Long nor Gibbs (reportedly Courtney Forde’s aunt) said anything to support the notion that there was any organized effort afoot to conceal evidence or get rid of witnesses. Long was instead intent on soliciting Gibbs’s help to get a job for Long’s girlfriend Newsome.
The reference to an eyewitness to the shooting came up in Long’s conversation with Newsome only after she pressed Long for his assurance that the indictment was “just bullshit.” Long points out to News-ome that he was not originally charged with murder when he was first arrested, that he made a statement to police because he had “nothing to hide,” and that “ I’ve been on some peaceful shit for God knows how long." With regard to the witness, Long laughs and points out that she is a “prostitute” with “no credibility.” “And the thing about it was home girl wasn’t even there,” Long adds. This conversation is hardly consistent with an effort to recruit Newsome into a plot with others to kill the witness, nor does it suggest that Long is so concerned about that witness’s testimony that he would kill her, as Moran implies in his affidavit.
Long’s advice to Courtney Forde to “fall back . . . way back” came after Forde told him that Richard Long had dropped by Fdrde’s house to talk about the shooting. In this context, the comment seems to be advice to Forde not to talk to anyone about the events — -not criminal in itself. The rest of the conversation is spent on money — the primary topic in all of these recordings. “I need you to help me out financially,” Long tells Forde. Forde hangs up and Long continues to talk to Newsome, primarily about their relationship together.
Moran’s testimony at the hearing was even more significant with regard to his statement in his affidavit that “the objective of this investigation will not be reached through the use of normal investigative means” and that “the only means of gathering evidence” is through a wiretap of the telephone booth at the jail. In particular, Moran admitted at the hearing that not only did police suspect that Forde was the second shooter, but they also believed they had enough to arrest him. Police had Forde’s telephone number, had an address for him, and knew that Forde’s father was on the MBTA police force. Other than talking once with his mother, however, police made no further effort to track down Forde before applying for the wiretap warrant.
Moran testified that police did not pick up Forde for questioning because they did not want to tip him off that he was a suspect. This explanation undercuts Moran’s claim, however, that, when he wrote the affidavit, he was veiy concerned that Forde and others linked to Long would try to kill the witness Lyndia Lewis. If this had been a real concern, then it is hard to understand why police would let Forde remain on the streets, particularly since he could veiy well shed light on other details of the investigation, including where the weapons used in the shooting could be found. Moran’s professed concern for the witness’s safety is also belied by the fact that police made no secret at the time of Long’s arrest that they had an eyewitness. Finally, Moran admitted that no special efforts were made at any time to protect Lyndia Lewis or other witnesses — again undercutting the claim there was any real belief on law enforcement’s part that Lewis or anyone else was in real danger.
DISCUSSION
Mass. Gen. Laws Ch. 272, §99 prohibits the recording of oral communications without the consent of all parties. There are, however, two statutory exceptions applicable where the surveillance is conducted by law enforcement officials in the course of investigating statutorily prescribed offenses related to organized crime. G.L.c. 272, §99D(l)(d). The statute permits warrantless surveillance of oral and wire communications performed by a law enforcement official who is a party to the conversation or who has the consent of at least one party. G.L.c. 272, §99B(4). The statute also permits non-consensual interception performed pursuant to a wiretap warrant issued in conformity with the statute. G.L.c. 272, 99D(l)(d).
*8 Wiretap use is appropriate only where police have exhausted traditional investigative techniques. G.L.c. 272, §99E(3). Moreover, “[t]he use of such devices by law enforcement officials must be conducted under strict judicial supervision and should be limited to the investigation of organized crime.” G.L.c. 272, §99A. Accordingly, a wiretap warrant must be supported by probable cause that the interception would “lead to evidence of a designated offense in connection with organized crime.” G.L.c. 272, §99E. Where law enforcement relies on recorded oral evidence to obtain a wiretap warrant, “a copy or detailed description thereof should be annexed to or included in the application.” G.L.c. 272, §99F(3).
Here, defendants Long and Brown move to suppress the contents of recorded oral communications and any fruits therefrom on the grounds that the warrant does not conform to the requirements of the statute. G.L.c. 272, §99P. This Court must review the wiretap application in a practical and commonsense manner to determine whether it sets forth “minimally adequate facts to support the finding of the issuing judge.” Commonwealth v. D’Amour, 428 Mass. 725, 736 (1999), quoting United States v. Smith, 726 F.2d 852, 864 (1st Cir. 1985). Where the affidavit supporting the warrant contains intentionally or recklessly misleading statements, the Court may consider evidence beyond the four corners of the warrant after conducting an evidentiary hearing. Franks v. Delaware, 438 U.S. 154, 171-72 (1978).
Upon review of the aforementioned evidence, I find that the search warrant was invalid for the following reasons. First, the police failed to exhaust normal investigative methods before applying for the warrant. Next, considering both the Moran affidavit and the hearing testimony, I conclude that there was insufficient evidence to establish probable cause that police would uncover evidence of a designated offense connected with organized crime as required by the statute.
A. Necessity
The defendants argue that Quincy police failed to exhaust traditional investigative before applying for the wiretap warrant. Police may properly apply for a wiretap warrant only where “normal investigative procedures have been tried and failed or reasonably appear unlikely to succeed if tried.” G.L.c. 272, §99E(3). This requirement demonstrates the Legislature’s intention that electronic surveillance of citizens by law enforcement officials in this Commonwealth be the exception, and not the rule. Commonwealth v. Price, 408 Mass. 668, 678 (1990).
An affidavit will be adequate if it indicates a reasonable likelihood that normal investigative techniques have failed in gathering evidence, or would fail if attempted. Commonwealth v. Fenderson, 410 Mass 82, 84-85 (1991); United States v. Ashley, 876 F.2d 1069, 1073, (1st Cir. 1989). Although police need not exhaust every possible investigative technique, Commonwealth must show that they have pursued traditional methods and/or reasonably believe that normal investigative techniques will fall short. See Commonwealth v. Wilson, 405 Mass. 248 (1989) (warrant appropriate where police unable to conduct physical surveillance of suspect’s home); Fenderson, 410 Mass. at 85 (warrant valid where affidavit stated with sufficient specificity why traditional methods would not have yielded the information sought by the investigators). The necessity requirement is meant to “assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.” Fenderson, 410 Mass at 84, quoting United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).
Here, the Commonwealth has failed to show that the warrant was necessary to expose or prevent crime. Police had Deryck Long in custody for the murder of Jamal Vaughn and had focused in on Forde as the second shooter. They had quickly and successfully uncovered Forde’s name, address and telephone number in the course of their investigation. Although police believed Forde to be the second shooter in the Vaughn murder, they took few steps to locate or apprehend him. Although they talked to Forde’s mother (who said she did not know where he was) they knew that his father was an MBTA police officer but never attempted to contact the father in an effort to locate his son. If they had picked up Forde — if only to interview him — it is probable that they would have turned up additional information helpful to their investigation. They instead chose to use wiretapping, which should be a last resort.
B. Organized Crime Nexus
The defendants contend that the Commonwealth has failed to show that the offense for which there is probable cause is connected to organized crime within the meaning of the statute. Defined by the preamble of Section 99 and interpreted by the court in Commonwealth v. Thorpe, 384 Mass. 271, 277 (1981), the term “organized crime” means a “continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services.” G.L.c. 272, §99A.
Although organized crime includes more than professional criminal organizations and “full-time professional criminals,” the Supreme Judicial Court has drawn a distinction between “more ‘garden-variety’ criminal activity, where wiretapping is impermissible, and crimes requiring the high degree of discipline and organization of organized crime.” See Commonwealth v. D'Amour, 428 Mass. 725, 737 (1999). Thus, courts have found “organized crime” where there exists some structured group which is providing an illegal service. See e.g. Wilson, 405 Mass. at 248 (two inmates and a girlfriend head prison drug smuggling ring); Thorpe, 384 Mass. 271 (police officers broker advance copies of sergeant’s exams); Commonwealth v. Lykus, 406 *9 Mass. 135, 142 (1989) (group of suspects commit kidnapping for ransom) D’Amour, 428 Mass. at 737 (defendant wife hires professional killer in attempt to collect husband’s insurance proceeds). A crime is not organized crime simply because there are two people involved. Commonwealth v. Jarabek, 384 Mass. 293 (1981) (no organized crime where school officials extorted kickback from contractor).
Here, the affidavit does establish that there was probable cause to believe that Vaughn had been murdered by two people, only one of whom had been identified. Although murder is a “designated offense” under the wire tap statute, this Court concludes that it was not connected to organized crime as that term has been defined by the courts but was rather a garden variety street shooting. Specifically, there is no evidence that either drugs or money motivated the killing, or that the murder was connected to a broader web of criminal activity. Although the Moran Affidavit makes much of the fact that Long asked Newsome to arrange for his friends to visit and implies the existence of some “organization” with criminal goals in mind, this Court’s review of entire content of the conversations does not bear that out.
C. Designated Offense
The Commonwealth argues that, apart from the offense of murder, there was probable cause to believe that a plot to intimidate or even kill a witness was afoot. If supported by probable cause, the Commonwealth could well be correct in asserting that this is the kind of offense which could be considered connected to “organized crime.” The problem is, however, the facts contained in the Moran Affidavit, coupled with the facts presented at the Franks hearing, do not add up to probable cause that this offense was about to be committed.
The Moran Affidavit states that Long appeared to be encouraging his “associates” to visit him in jail so that they could figure out a way to “save the indictment,” and that that phrase itself implied that a conspiracy existed to kill the eyewitness. The actual conversations reveal a far different concern. Long first raised with Newsome the issue about visitors by stating that he needed money for the jail canteen (“I ain’t washed my ass since Sunday, you know what I mean?”). He continued to press his friends (including Richard Long) to visit him in order to assist him financially rather than for some other more sinister motive, as the Moran Affidavit states. As to the eyewitness and her supposed importance to the case against Long, she is mentioned only rarely in these conversations. In the longest exchange about her (between Newsome and Long), it was agreed that, as Long put it, “her credibility is bullshit” and that there was little cause for concern. Moreover, the term “save the indictment” upon which Moran hangs his hat is itself ambiguous and could mean only that Long needed to talk to his friends in order to prepare a defense. Aware that his telephone calls are not private (“I need to politic with you outside this airway”), Long asked Newsome and his nephew Richard Long to come visit him in person-not sinister in and of itself.
In addition to the conversation with Newsome, the Moran Affidavit relates a portion of a conversation that Long had with Courtney Forde in which he tells Forde (who volunteers that he is “laying low”) to “fall back . . . way back.” What the Moran Affidavit does not say is that most of the conversation with Forde appears to concern Long’s need for money and his hope that Forde will help him out financially. He also asks Forde to pass on some “broccoli” (apparently meaning marijuana) to Newsome and a “little paper” (presumably money) so that “I could get a little love up here.” In addition, Long’s insistence that Forde “fall back” is inconsistent with Moran’s allegation that the defendant was involved in a “plot to prevent a key eye witness from testifying against him [Long], which may include instructions to murder the witness.” In short, police did not have the facts necessary to support this wiretap application: it is insufficient not just on one grounds but on several.
CONCLUSION AND ORDER
For all the foregoing reasons, the defendants’ Motion to Suppress Evidence is ALLOWED.

 Inmates are informed that their calls to those outside the jail are subject to monitoring, so there is no claim that these conversations were improperly intercepted.